DECISION AND JOURNAL ENTRY
{¶ 1} Defendant/Appellant appeals his conviction in the Wayne County Court of Common Pleas. We affirm.
 {¶ 2} On June 18, 2007, Defendant was indicted on one count of murder in violation of R.C. 2903.02(B), an unclassified felony; one count of attempted murder in violation of R.C. 2923.02 and R.C. 2903.02(A) or (B), a first-degree felony; one count of aggravated arson in violation of R.C. 2909.02(A)(1), a first-degree felony; and one count of aggravated arson in violation of R.C. 2909.02(A)(2), a second-degree felony. The charges arose after Kyle Kelley was killed in a house fire at 355 N. Buckeye Street, Wooster, Ohio, on May 29, 2007, that was ruled an arson. Defendant's estranged wife, Yolanda Adams, nka Yolanda Simons, also lived in the home.
 {¶ 3} Defendant was tried to a jury between October 15, 2007, and October 18, 2007, and convicted on all charges. On November 7, 2007, Defendant was sentenced to consecutive *Page 2 
prison terms of 15 years to life on the murder count, 10 years on the attempted murder count, and seven years on each of the aggravated arson counts.
 {¶ 4} Defendant timely appealed and raises four assignments of error.
 Assignment of Error No. I "The State of Ohio violated [Defendant's] constitutional right to due process of law under Brady v. Maryland and its progeny, where it failed to disclose evidence of witness statements in the State's possession which impeached the testimony of a key prosecution witness and which identified other potential suspects who had motive to harm the victims of the house fire, and the trial court erred by denying [Defendant's] motion for new trial where Brady violations occurred." (Emphasis added.)
 {¶ 5} In his first assignment of error, Defendant asserts that the trial court erred when it failed to grant his motion for new trial after the State failed to disclose impeachment and exculpatory evidence in contravention of Brady v. Maryland (1963), 373 U.S. 83 and Crim. R. 16(B)(1)(f). Specifically, Defendant asserts that the State committedBrady violations when it failed to disclose: (1) written police statements of Lamont Griffith and Mike Crossno that were inconsistent with prior statements and which would "cast doubt on Mr. Griffith's truthfulness and the reliability of his eyewitness identification of [Defendant]" and (2) oral statements made by Amy Allen to Wooster police about other potential suspects. Defendant maintains that if these oral and written statements had been provided to him "in pretrial discovery so as to be fully developed for trial, [it] might have affected the outcome of [Defendant's] trial."
 {¶ 6} The State argues that the statements at issue were notBrady material because they were disclosed to counsel during trial. Moreover, the State argued that defense counsel extensively cross-examined all of the witnesses regarding the very issues he argues prejudiced his client. The State also argues that this evidence is not exculpatory, favorable, or material so as to create "a reasonable probability that, had the information been disclosed to the defense, the *Page 3 
result of the proceeding would have been different." United States v.Bagley (1985), 473 U.S. 667, 682; State v. Willey (1981),5 Ohio App.3d 86, 91.
 {¶ 7} "A trial court's ruling on a motion for a new trial under Crim. R. 33 will be reversed only for an abuse of discretion." State v.Herb, 167 Ohio App.3d 333, 2006-Ohio-2412, at ¶ 6, citing State v.Haddix (1994), 93 Ohio App.3d 470, 480. "An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling." State v.Travis, 9th Dist. No. 06CA0075-M, 2007-Ohio-6683, at ¶ 24, citingBlakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. In applying the abuse of discretion standard, the appellate court does not substitute its judgment for that of the trial court. Pons v. Ohio State Med.Bd. (1993), 66 Ohio St.3d 619, 621.
 {¶ 8} "The essential inquiry is whether the substantial rights of the accused are adversely or materially affected. Crim. R. 33(A). A defendant may move for a new trial under Crim. R. 33(A) upon a showing of one of six grounds[,]" including irregularity in the proceedings. Herb at¶ 6, citing Crim. R. 32(A). Defendant moved for a new trial pursuant to Crim. R. 33(A)(2), which allows a trial court to grant a new trial for "misconduct of the jury, prosecuting attorney, or the witnesses for the state[.]" First, this Court must determine whether the State engaged in misconduct as alleged by Defendant. See State v. Taylor (1991),73 Ohio App.3d 827, 833 (discussing the analysis of juror misconduct under Crim. R. 33(A)(1).) If so, we must then determine whether the misconduct materially prejudiced Defendant's substantial rights so as to demonstrate that the trial court abused its discretion when it denied Defendant's motion for new trial. See id.
 {¶ 9} Defendant asserts that his due process right to a fair trial was violated when the State failed to disclose the statements described above during the discovery process. When the *Page 4 
state "fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld." Illinois v. Fisher (2004),540 U.S. 544, 547, citing Brady, 373 U.S. at 83, and Agurs, supra.
 {¶ 10} "However, in United States v. Agurs (1976), 427 U.S. 97, * * * it was stated:
 `The rule of Brady * * * arguably applies in three quite different situations. Each involves the discovery, after trial, of information which had been known to the prosecution but unknown to the defense.' (Emphasis added.)
 "As the alleged exculpatory records were presented during the trial, there exists no Brady violation requiring a new trial." (Emphasis sic.) State v. Wickline (1990), 50 Ohio St.3d 114, 116.
 {¶ 11} Here, Defendant's argument is that he was not provided with the alleged exculpatory and/or impeachment evidence during the discovery process prior to trial. During the trial court's November 6, 2007 hearing on Defendant's motion for new trial, defense counsel again challenged only the fact that he had not been provided with the evidence at issue until trial and also acknowledged that defense counsel "had the opportunity to cross-examine these people * * * on all of these issues."
 {¶ 12} Based on the foregoing and Wickline, the State did not engage in misconduct or violate the Brady rule substantially affecting Defendant's rights. The trial court did not abuse its discretion in denying Defendant's motion for new trial and the Defendant was not denied due process.
 {¶ 13} Defendant's first assignment of error is overruled.
 Assignment of Error No. II "The trial court erred in violation of [Defendant's] constitutional right to compulsory process by not allowing [Defendant] to call a subpoenaed witness to the stand in front of the jury in order to exercise his privilege against self-incrimination." *Page 5 
 {¶ 14} In his second assignment of error, Defendant argues that his constitutional right to compulsory process was denied when the trial court did not allow a subpoenaed witness (David Edwards) to take the stand and invoke the privilege in the presence of the jury. Defendant maintains that the Sixth Amendment to the United States Constitution provides "an accused with a right of compulsory process to obtain a witness's testimony."
 {¶ 15} The Supreme Court of Ohio directly addressed this issue inState v. Kirk (1995), 72 Ohio St.3d 564 and held that, "a trial court may exclude a person from appearing as a witness on behalf of a criminal defendant at trial if the court determines that the witness will not offer any testimony, but merely intends to assert the Fifth Amendment privilege against self-incrimination." Id. at 569, paragraph one of the syllabus. The Kirk court distinguished the facts before it from its previous opinion in Columbus v. Cooper (1990), 49 Ohio St.3d 42, by noting that in Cooper, "(1) the privilege [was] asserted prior to trial, and (2) the witness intend[ed] to testify `on behalf of the defendant." Id. at 568.
 {¶ 16} Here, the trial court voir dired Edwards outside of the presence of the jury and Edwards testified that he intended to "use [his] Fifth Amendment rights not to testify"; i.e., he did not intend to testify on behalf of Defendant. Moreover, as Defendant subpoenaed Edwards prior to Edwards being indicted, he did not assert the privilege prior to trial.
 {¶ 17} The Kirk court also held that "[w]here a defendant is not entitled to call a witness to the stand because of the witness's intention to assert the Fifth Amendment privilege against self-incrimination, the defendant is entitled to request an instruction that the jury should draw no inference from the absence of the witness because the witness was not available to either side. Such an instruction is intended to reduce the danger that the jury would, in fact, draw an inference from the absence of a witness who could corroborate defendant's testimony." Id. at *Page 6 
569 and ¶ 2 of the syllabus. Here, defense counsel requested a jury instruction related to Edwards' absence and the court instructed the jury as follows:
 "the jurors should draw no inference from the absence of any witness, including David Edwards who was called by the Defense, because that witness or any witness was not available to either side."
 {¶ 18} Based on the foregoing and the holding of Kirk, supra, the trial court did not err when it denied Defendant's request that Edwards take the stand to assert his Fifth Amendment privilege in the presence of the jury. Defendant's second assignment of error is overruled.
 Assignment of Error No. III "The trial court abused its discretion and erred to the prejudice of [Defendant] by allowing the State to introduce, over objection, irrelevant and unfairly prejudicial `other acts' testimony concerning two unrelated misdemeanor domestic violence offenses involving [Defendant] and his wife."
 {¶ 19} In his next assignment of error, Defendant argues that the trial court erred in allowing police officer William Gilkison of the Wooster Police Department and Adams to testify about "two unrelated misdemeanor domestic violence offenses committed by [Defendant] in June of 2006 and early March of 2007." The prior offenses were committed against Adams and Defendant was charged with the attempted murder of Adams in the instant case.
 {¶ 20} "We review the trial court's admission or exclusion of evidence for an abuse of discretion." Travis at ¶ 24, citing State v.Apanovitch (1987), 33 Ohio St.3d 19, 22.
 {¶ 21} "The Supreme Court of Ohio has articulated two requirements for the admission of other acts evidence. First, substantial evidence must prove that the other acts were committed by the defendant as opposed to another person. Second, the other acts evidence must fall within one of the theories of admissibility enumerated in Evid. R. 404(B)." (Internal citations omitted). State v. Stephens, 9th Dist. No. 23845,2008-Ohio-890, at ¶ 14, citing State v. Broom (1988), 40 Ohio St.3d 277,282. See also, State v. Lowe (1994), 69 Ohio St.3d 527, 530. *Page 7 
 {¶ 22} In State v. Roper, 9th Dist. No. 22566, 2005-Ohio-6327, we held that:
 "Generally, evidence of prior criminal acts completely independent of the crime for which a defendant is being tried, is inadmissible. State v. Wilkins (1999), 135 Ohio App.3d 26, 29, citing State v. Thompson (1981), 66 Ohio St.2d 496, 497. However, an exception to this general rule exists, as provided for in R.C. 2945.59 and Evid. R. 404(B). [State v. Ali (Sept. 9, 1998), 9th Dist. No. 18841]. Evid. R. 404(B) provides that evidence of such crimes, wrongs or acts may be admissible for purposes other than proving the conformity of an accused with a certain character trait during the incident in question. Specifically, Evid. R. 404(B) provides the following:
 "`Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'
 "R.C. 2945.59 reads:
 "`In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of any other crime by defendant.]'" (Emphasis sic.) Roper at ¶ 8, reversed on other grounds, 109 Ohio St.3d 313, 2006-Ohio-2109.
 {¶ 23} We further noted in Roper that:
 "[T]the standard for determining admissibility of such evidence is strict, and the statute section and rule must be construed against admissibility. Ali, supra, citing Broom, 40 Ohio St .3d at paragraph one of the syllabus. However, this strict admissibility standard must be considered contemporaneously with the fact that the trial court `occupies a "superior vantage" in determining the admissibility of evidence.' Ali, supra, citing State v. Rutledge (Nov. 19, 1997), 9th Dist. No. 96CA006619." Roper at ¶ 9.
 {¶ 24} Defendant does not dispute that the other acts at issue were committed by him. Thus, the first prong of Broom, supra, is satisfied. The following other acts testimony was admitted, over objection. *Page 8 
 {¶ 25} During Officer Gilkison's testimony about his knowledge of Defendant's conduct potentially related to the house fire, Officer Gilkison testified that he knew of Defendant from a previous domestic situation between Defendant and Adams, during which Defendant threatened to shoot Adams. Gilkison testified that he arrested Defendant for that incident on March 2, 2007. Gilkison further identified the criminal complaint filed in the case, explained that the charge was a misdemeanor of the second degree, and noted that Defendant was convicted and jail time imposed.
 {¶ 26} Adams testified about an incident that occurred on June 26, 2006, between her and Defendant. Adams indicated that Defendant assaulted her after a heated argument and Defendant was arrested. Adams indicated that Defendant was convicted and incarcerated for this incident. The entry of conviction indicated that Defendant was convicted of a fourth-degree misdemeanor.
 {¶ 27} Adams also testified about the March 2, 2007 incident, which she said occurred because she had told Defendant she wanted to end the marriage. Adams testified that Defendant had a gun and told her that if she called the police, she would "be dead before they got there and that was a promise[,]" not a threat.
 {¶ 28} The trial court allowed the foregoing testimony after determining that the evidence was admissible because it related to the issue of motive. The State contends that "[e]vidence of the prior acts on his wife and threats to kill his wife were relevant to identity and Adams' motive of revenge." We agree, especially with regard to the March 2, 2007 incident (two and one-half months prior to the house fire), during which Defendant threatened to kill Adams when she told him she wanted to end the marriage. Adams was living in the house at 355 N. Buckeye Street after she left Defendant with the intent to end the marriage. *Page 9 
 {¶ 29} The evidence of the June 26, 2006 incident does not so clearly establish motive. Adams testified that the argument between herself and Defendant ensued after Adams's daughter failed to clean her room. It was not related to the status of their marriage. "That being said, however, we find the error to be harmless given the `myriad of evidence' presented against Defendant during the trial, as will be set forth in our discussion of Defendant's [fourth] assignment of error." State v.Morrow, 9th Dist. No. 23960, 2008-Ohio-3958, at ¶ 18, quoting State v.Lyons, 9th Dist. No. 03CA0023-M, 2003-Ohio-5783, at ¶ 29.
 {¶ 30} Based on the foregoing, we hold that the trial court did not abuse its discretion in allowing the above-described testimony. Defendant's third assignment of error is overruled.
 Assignment of Error No. IV "There was insufficient evidence to support the jury's verdicts of guilty as to all four counts of [the] indictment, and those convictions were against the manifest weight of the evidence."
 {¶ 31} In his last assignment of error, Defendant argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.
 {¶ 32} We review a trial court's denial of a Crim. R. 29 motion by assessing the sufficiency of the evidence "to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. To make this determination, we must view the evidence "in the light most favorable to the prosecution." Id.; State v. Feliciano (1996), 115 Ohio App.3d 646,653. "In essence, sufficiency is a test of adequacy." State v.Thompkins (1997), 78 Ohio St.3d 380, 386.
 {¶ 33} "While the test for sufficiency requires a determination of whether the [S]tate has met its burden of production at trial, a manifest weight challenge questions whether the [S]tate *Page 10 
has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1, citing Thompkins, 78 Ohio St.3d at 390 (Cook, J., concurring). When a defendant asserts that his conviction is against the manifest weight of the evidence,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
 {¶ 34} This discretionary power may only be invoked in extraordinary circumstances if the evidence presented weighs heavily in favor of the defendant. Id. As sufficient evidence is required to take a case to the jury, a conclusion that a conviction is supported by the weight of the evidence necessarily includes a finding of sufficiency. State v.Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *2.
 {¶ 35} Based on a review of the record, this Court finds it reasonable that the jury could have believed the testimony and evidence proffered by the State and convicted Defendant of murder, attempted murder, and aggravated arson. The jury heard the testimony of thirteen witnesses on behalf of the State, in addition to Gilkison and Adams. Defendant did not testify but presented three witnesses.
 {¶ 36} Defendant was convicted of murder in violation of R.C. 2903.02(A) and (B), which state that "(A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy. (B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." *Page 11 
 {¶ 37} Defendant was convicted of an attempted murder in violation of R.C. 2923.02 and R.C. 2903.02(A) and (B). R.C. 2923.02 states that, "[n]o person purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A).
 {¶ 38} Defendant was also convicted of aggravated arson in violation of R.C. 2909.02(A)(1) and (A)(2), which state that, "(A) No person, by means of fire or explosion, shall knowingly * * * (1) Create a substantial risk of serious physical harm to any person other than the offender; [or] (2) Cause physical harm to any occupied structure[.]"
 {¶ 39} Gilkison testified that he saw Defendant on Memorial Day, May 28, 2007, at the Memorial Day parade in Wooster. Gilkison explained that he asked Defendant why he was still in town when he had previously indicated he was going to join the U.S. Marine Corps. Gilkison testified that Defendant told him he had "to do 28 days in lock up * * * because of that bitch." Gilkison understood that Defendant was referring to Adams. Gilkison also testified that he responded to the house fire and recognized Defendant in the crowd of on-lookers. Gilkison acknowledged that Defendant lived in the neighborhood.
 {¶ 40} Patrick Coyne testified that he had been living on Buckeye Street for about two weeks prior to the fire. Also living at the house, Coyne explained, were Kelley, Amy Allen, Cheryl Gorfy and Adams, although Adams also lived somewhere else. During the evening of the fire, several people were in and out of the house, including Adams and one of her daughters, stated Coyne. Toward the end of the evening, Coyne testified, only Kelley, Allen and himself were at the house. Coyne explained that at about 11:30 p.m., Allen and Kelley went upstairs to go to bed. Coyne stated that he went upstairs to bed about 12:20 a.m . . Coyne indicated that he *Page 12 
knew precise times because of the remote control he was using to watch TV. A few minutes later, at 12:35 a.m., Coyne stated, he heard one of the dogs barking and a noise "like someone came in the door and shut the door[.]" Coyne testified that he looked out of the window and saw "a reflection on the neighbor's house, a yellow and orange like a flickering, really intense flickering reflection on the side of their house."
 {¶ 41} Coyne testified that he then left his room and ran up the hall to bang on Allen and Kelley's bedroom door and warn them of the fire. Coyne indicated that once he heard Allen and Kelley moving inside the room, he ran down the stairs to the landing and saw "the whole front of the house was just in flames." Coyne stated that he turned on the lights but still could not see because the smoke was so thick. Coyne indicated that he tried to verbally guide Kelley and Allen out but, "[b]y then it was so hot [he] couldn't stand there any longer." Coyne testified that he ran out the back door and could hear Kelley and Allen yelling from inside the house. Coyne indicated that he yelled back at them encouraging them to jump out the window onto a little roof that was under his bedroom window. Coyne said he was also yelling for help, but it was "total bedlam." Coyne finally testified that he saw Allen appear in a bedroom window and crawl out feet first onto the roof, after which everyone helped her down. After Allen escaped, Coyne testified that she was "going nuts" trying to get back into the house to Kelley and that he heard "windows just blasting out like hand grenades * * * going off." Coyne identified various pictures of the scene and of Kelley. Coyne finally testified that there was never any gasoline stored on the front porch.
 {¶ 42} David Griffith testified that he lived at 411 N. Buckeye Street, two houses north of 355 N. Buckeye, on the day of the fire. Griffith explained that he was watching TV at about 12:30 a.m. and saw a "yellow flash of light" come through the front windows of his home that lit *Page 13 
up the room and heard a "low frequency thud." Griffith explained that he looked out his window and saw the porch at 355 N. Buckeye on fire. Griffith testified that he then ran and called 911 from his wife's cell phone and then ran to the scene to try to help. Griffith testified that he heard yelling from inside the house and that the yelling "was not like anything [he'd] ever heard." Griffith stated that he could not get close enough to help because the heat was so intense. Griffith testified that he did knock on the door of the house next door — 401 N. Buckeye — to warn them of the fire. Griffith finally equated the flash and explosion of the fire to a previous experience he had with wet leaves, kerosene and flame.
 {¶ 43} Andrew Thornton was the 9-1-1 dispatcher in Wooster on the day of the fire. He testified that the first call came in to 9-1-1 at about 12:41 a.m. and he took 21 calls about the fire thereafter. Thornton explained that all of the callers were "panicky" and that during one phone call, he could hear people inside the burning house screaming for help.
 {¶ 44} Jeff Buzzard testified that he was one of the firefighters from Station One of the Wooster Division of Fire who responded to the 355 N. Buckeye fire, along with Station Two firefighters. Buzzard testified that when he arrived at the house, he noticed "there was a large amount of fire on the porch[.] * * * It looked like pretty much the whole front house, the lower level was on fire[.]" Buzzard stated that he was "surprised to see the amount of fire for a porch fire." Buzzard further described the heat and severity of the fire and the efforts he and other firefighters took to extinguish it. Buzzard explained that it was his understanding that there were children trapped inside the house.
 {¶ 45} David Shaffer was a Wooster paramedic who responded to the house fire after being dispatched at 12:40 a.m . . Shaffer testified that when he arrived at the house, he took a ladder to the back of the house where he was informed by three people that a person named Kyle *Page 14 
was on the second floor. Shaffer described his and the other paramedic's entry into the house and the heat and smoke of the fire. Shaffer testified that they found Kelley's body by crawling through the second floor waving their hands and tools in front of them. Shaffer explained how they removed Kelley from the house and noted that Kelley was unresponsive. Shaffer stated that he performed CPR on Kelley until EMS took over and Kelley was taken to the hospital.
 {¶ 46} Brian Peterman was a fire investigator with the Department of Commerce, Division of State Fire Marshall, who investigated the house fire at 355 N. Buckeye. Peterman testified that he was the handler of a canine named Lacy used to detect fire accelerants and was an expert in analyzing burn patterns, determining the point of origin of a fire, analyzing fuel loads, and determining an ignition source for the fire.
 {¶ 47} Peterman indicated that he started investigating the fire because that is the protocol where there are injuries. Peterman stated that he began by walking around the exterior of the house to get an overall picture of the damage to the structure. Peterman "observed fire patterns from the front porch area that were heavier" than the other parts of the house so as to cause him to believe "the fire originated on —-within the front porch." Peterman then described his investigation of the interior of the house and how he ruled out various locations as the origin of the fire. Peterman then described his analysis of the burn patterns and how they demonstrated that the fire started downstairs and spread upwards and that the fire spread from outside of the structure into the living room, i.e., that the fire originated on the porch. Peterman also stated that he saw indications of low-level burning that appears "when an ignitable liquid has been used to accelerate [a] fire." Peterman then testified that he deployed Lacy to the porch. Peterman explained that Lacy was trained to alert when she detected a trace amount of ignited liquid and that she alerted several times on the front porch. Peterman testified that he then collected *Page 15 
samples from the alert locations for submission to the forensic laboratory and identified those samples as well as various photographs. Peterman opined that "the cause of that fire was a deliberate act, an incinerary fire, arson and that an ignitable liquid had been thrown or spread across the front porch of that structure and deliberately ignited by an unknown person[.]"
 {¶ 48} Ray Ladrick was the criminalist who examined the samples taken from the house fire. Ladrick testified that he was employed by the State Fire Marshall in its forensic laboratory. Ladrick indicated that he analyzes samples for the presence of all types of hydrocarbons or ignitable products. Ladrick identified the ten samples taken from the house fire and the sample submission form. Ladrick then identified his report and testified that eight of the ten samples tested positive for gasoline. Ladrick stated that the samples did not test positive for any other type of ignitable liquid.
 {¶ 49} Dr. Dorothy Dean was the forensic pathologist and deputy medical examiner who examined Kelley's body. Dr. Dean identified eight photographs of Kelley's body taken during the autopsy and her autopsy report. Dr. Dean opined that Kelley suffered from smoke inhalation and burns, but she could not tell if the burns came before or after Kelley died.
 {¶ 50} Dr. Amy Joliff was the Wayne County coroner who responded to the house fire. Dr. Joliff explained that she also went to the hospital where she took photographs, conducted an examination of Kelley's body, and eventually processed Kelly for autopsy. Dr. Joliff identified various pictures of the scene and Kelley's body. Dr. Joliff also identified her report and opined that Kelley died of smoke inhalation or asphyxiation caused by the house fire.
 {¶ 51} Adams, as noted above, was Defendant's estranged wife at the time of the fire and had been living at 355 N. Buckeye. Adams testified that she and Defendant were married on October 21, 2005, and that she had two daughters from a previous relationship. Adams stated *Page 16 
that she lived mostly with Defendant until the March 2, 2007 incident described above. Adams testified that after that incident, she and her daughters moved out and eventually to the N. Buckeye address. Adams explained that she knew of the house because she knew Kelley from a previous "on and off romantic relationship." Adams stated that when she moved onto N. Buckeye, Defendant was incarcerated and that after he was released, he moved in with his mother at an address in the same neighborhood as 355 N. Buckeye. Adams indicated that in late April to early May of 2007, she filed for divorce from Defendant and Defendant was served with the complaint in mid May.
 {¶ 52} During the time she was living at N. Buckeye, Adams explained, she was not staying at the house every night because she was staying with Charlie Miller who lived on N. Columbus Avenue in Wooster. Adams stated that she sometimes left her car at N. Buckeye even when she was not there "[s]o no one could realize where I was at and where I wasn't" because she was trying to protect herself from Defendant.
 {¶ 53} Adams testified that she saw Defendant at the Memorial Day parade on May 28, 2007, when she was with Miller and her daughters. Adams stated that when Defendant saw her, he was 50 feet away and started yelling and running. Adams indicated that she then told Miller that they had to protect the house at 355 N. Buckeye, although she did not know why she felt that need. Adams, her daughters, and Miller then went to N. Buckeye where they stayed until 9:00 p.m. after which they returned to Miller's house. Adams testified that she was suffering from a migraine headache that night and went to the hospital with Miller about 10:00 p.m. and first learned of the fire at 4:00 a.m. when a detective came to her hospital room.
 {¶ 54} During cross-examination, Adams acknowledged that in addition to Miller and Kelley, she had also dated a man named J.P. Haas who was unhappy when Adams ended the *Page 17 
relationship. Adams testified that Haas lived at 355 N. Buckeye from the beginning of April 2007, until the second week of April, when he was asked to leave the house because he and Adams were no longer dating. Adams agreed that a report prepared by Detective Heim indicated that Adams had told him on May 30, 2007, that Haas may have been involved in the fire because he knew the layout of the house. Adams did not remember saying this to Heim. Adams also acknowledged a police report stemming from an incident on May 6, 2007, during which Adams saw a man in her yard who the report indicated she identified as Defendant or Haas. Adams acknowledged other statements to the police including that Kelley never had a problem with Defendant but did have a problem with Haas. Adams also stated that Defendant did not have any problems with anyone else living at 355 N. Buckeye.
 {¶ 55} Allen testified that she lived at 355 N. Buckeye and was home on the night of the fire. Allen agreed with the other witnesses as to who was living in the house at that time. Allen indicated that Kelley was her fiancé. Allen indicated that she, Kelley and others went to the Memorial Day parade and swimming on May 28, 2007, and then returned home. Defendant participated in some of the events as well although he did not come back to 355 N. Buckeye Street that evening. Adams was not with them. Allen also stated that she and Kelley went briefly to Defendant's home (his mother's home) that evening to visit with its occupants but did not see Defendant, who was sleeping. Allen identified various pictures of the house and specific bedrooms. Allen explained that she and Kelley went to bed that night and fell asleep watching TV. Allen testified that she woke up when she heard the dog "going nuts and barking" and Coyne banging on the door yelling, "fire." Allen explained that she and Kelley then got out of bed and dressed and opened the bedroom door to black smoke. Allen stated that all they saw was black smoke and a glow from downstairs as they tried to escape by crawling. Allen *Page 18 
indicated that they somehow ended up in Adams' room where she lost Kelley. Allen then indicated that she escaped the house through a window and thought she heard Kelley, but "[b]y the time [she] got out of the house he wasn't out there." Allen also testified that she saw Defendant at the front of the house watching. Allen explained that she did not see paramedics take Kelley out of the house, but that just before they wheeled Kelley past her, she saw Defendant run, like he had seen a ghost, past Kelley's father, Paul who was at the scene. Allen described the burns to her hands, face and neck and her treatment. Allen also described the emotional impact of the fire and Kelley's death.
 {¶ 56} On cross-examination, Allen acknowledged a previous statement she made to a fire investigator that she had a physical disagreement with a man named Chris Asbury, who had said something insulting about her relationship with Kelley. Allen further stated that Kelley had told Asbury to leave her alone. Allen acknowledged that she had told the fire investigator that the rumor was that she had broken Asbury's jaw during their disagreement. Allen also admitted that she had an argument with Susan Baker the day before the fire and that she did not tell the police that she had been at Defendant's home the evening of the fire. Allen stated that she told police after the fire that she did not know who started it. Allen finally testified that she told police that Haas had threatened everyone in the house.
 {¶ 57} Crossno testified that on May 28, 2007, he was visiting with his cousin, Griffith and other friends at Griffith's house in Wooster. Crossno indicated that late that night (around 1:00 a.m.), he and Griffith walked one of the girls (Erica Lunsford) home. After they dropped Erica off, Crossno testified that he and his cousin decided to race back to Griffith's house. Crossno explained that the two decided to split up to see which route was the fastest. Crossno indicated that he ran into an alley and through a back yard and saw lots of smoke. Crossno stated *Page 19 
that he then saw his cousin "[c]oming back [and he] looked like he was scared." Crossno testified that he started to go that way to see what was going on but turned around because he didn't want to be involved in anything that happened. Crossno admitted that he did not call the police about what he had seen. Crossno testified that on or around June 5, 2007, the police called him to make a statement and identify Griffith's whereabouts.
 {¶ 58} Griffith's testimony substantially supported that of Crossno's although Griffith testified that he and Crossno left his house around 11:00 p.m. to walk Erica home. Griffith testified that he ran down Buckeye Street as he was racing Crossno back to his house. Griffith stated that he changed his route when he saw, from about 20 feet away, a man standing by the end of a driveway in the grass in front of the house. Griffith indicated that the man was using a lighter to try to light a ripped t-shirt that was stuffed in a jar that contained an apple juice-looking liquid. Griffith testified that the man was able to light the t-shirt after which the man "gave it a shove, push to the front porch of the residence on Buckeye Street." Griffith explained that the flaming jar first caught the porch swing on fire and then spread "around to the corners of the house." Griffith testified that he was hiding behind a tree during these events and that when he looked out, the man "stepped out into the street and another person came over to the street and met him." Griffith indicated that the man then "looked over and saw me" and then he and the man "locked eyes" and Griffith recognized who it was. Griffith indicated that the man then came within 10 feet of him and then "took off." Griffith identified Defendant as the man he saw that night and indicated that he was "one-hundred percent positive" in his identification and that it was Defendant who threw the flaming jar on to the porch.
 {¶ 59} Griffith explained that he told his school counselor about everything that happened the next day and she contacted his probation officer, who put him in contact with *Page 20 
police. Griffith acknowledged that he got the times of the events wrong in his first statement to police but later corrected them. Griffith then identified his position and Defendant's position on a map.
 {¶ 60} On cross-examination, Griffith acknowledged that he and Crossno had been drinking a little bit that night and that he had been unable to identify the specific house that had been burned when shown a map during the preliminary hearing. Griffith also admitted that he had previously misidentified the tree he had been standing behind. Griffith further acknowledged that he did not call the police or fire department and did not tell anyone what had happened until he spoke to his guidance counselor the next day. Griffith finally acknowledged that Kelley was his friend and that he was not friends with Defendant.
 {¶ 61} Mitchell Sleek testified on behalf of Defendant. Sleek worked at the nearby funeral home and testified about the location of the funeral home's security cameras and the meaning of the time-stamp on videos produced from the cameras. Sleek also testified that the cameras only record if there is motion taking place. The time lapsed video was then played for the jury.
 {¶ 62} Terry Heim was a detective with the Wooster Police Department who was involved in the investigation of the house fire. Heim picked up and viewed the video from the funeral home. Heim identified a person wearing a dark top and pants carrying something in a frame from the video time-stamped 12:28 a.m. on the night of the fire. Heim indicated that the person was Defendant. Heim stated that this identification was corroborated by Tim Winkleman (a person who lived with Defendant) who stated that the person in the video was wearing the same clothing as Defendant wore that evening. Heim testified that it would take 15 minutes to walk from Defendant's home to 355 N. Buckeye. *Page 21 
 {¶ 63} Heim also testified that he investigated several tiki torches found lying in the driveway of a house four houses north of 355 N. Buckeye. Heim indicated that the owner of the house told him that the torches had been in his back yard in the ground when he left for work at midnight on May 28, 2007, and that he found them in "an unusual position" when he returned.
 {¶ 64} Heim also testified that he spoke to Edwards during his investigation who told him that he had been drunk that night and passed out on his couch at his home, which was located in the neighborhood of the fire. Heim stated that Edwards also told him he had gone to Defendant's home that day looking for gasoline because his friend's car ran out of gas. When shown a picture of Edwards, during redirect, Heim testified that Edwards did not look anything like Defendant.
 {¶ 65} Mark Vassal was a computer forensic examiner hired by Defendant to review the report prepared by the State subsequent to its investigation of Defendant's computer and to analyze the hard-drive of Defendant's computer. Vassal testified that the timeline prepared by the State's expert was accurate. Vassal then testified that a user of the computer was logged on to MySpace starting around 12:20 p.m. on May 29, 2008. Vassal stated that the user was active at various times from sign-on until 12:54 a.m. and signed off at 2:27 a.m. Vassal testified that there was activity at 1:30 a.m. and 1:32 a.m. Vassal explained that Defendant's user name and password was used to log into MySpace. During cross-examination, Vassal acknowledged that he did not know if Defendant used his own user name and password or someone else did.
 {¶ 66} Having reviewed the evidence and the reasonable inferences that can be drawn therefrom, we conclude that Defendant's convictions for murder, attempted murder, and aggravated arson were not against the manifest weight of the evidence. Besides the eyewitnesss identification, testimony at trial established that Defendant had motive to commit the crimes. *Page 22 
Since Defendant's conviction is not against the manifest weight of the evidence, his conviction is also supported by sufficient evidence as well. See Roberts at *2. Defendant's fourth assignment of error is overruled.
 {¶ 67} Each of Defendant's assignments of error is overruled, and the judgment of the Wayne County Court of Common Pleas is affirmed.
Judgment affirmed
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
 Moore, P. J., Dickinson, J., concur. *Page 1