OPINION
{¶ 1} Defendant-appellant, Dante Jones ("appellant"), appeals from a judgment of the Franklin County Court of Common Pleas, whereby appellant was convicted of aggravated murder, tampering with evidence, carrying a concealed weapon, and having a weapon under disability. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} On July 13, 2007, appellant was indicted on one count of aggravated murder with specification in violation of R.C. 2903.01, an unclassified felony, one count of *Page 2 
tampering with evidence in violation of R.C. 2921.12, a felony of the third degree, one count of having a weapon while under disability in violation of R.C. 2923.13, a felony of the third degree, one count of improper handling of firearms in a motor vehicle with specification in violation of R.C. 2923.16, a felony of the fourth degree, and one count of carrying a concealed weapon in violation of R.C. 2923.12, a felony of the fourth degree.
 {¶ 3} A jury trial commenced on January 22, 2008, and the following facts were adduced. On July 3, 2008, Todd Lockett ("Lockett") and Brandon Byrd ("Byrd") went to a bar together called "Skye Bar," located near The Ohio State University campus, where they stayed until closing time. As Byrd and Lockett were leaving, they came upon a fight in the common area outside the bar, where it appeared that an individual, later identified as appellant, was being "jumped" by a group. (Tr. 257.) Byrd testified that neither he nor Lockett joined the melee and continued to proceed to Byrd's car, which was parked on a street near the parking garage. At about the same time, Byrd and Lockett noticed two women that they had seen inside the bar earlier that evening walking into the parking garage, so they decided to follow, hoping to catch up with them.
 {¶ 4} In the stairwell of the parking garage's second floor, Lockett and Byrd were approached by two males, who were later identified as Mathias White ("White") and appellant. Apparently, White and appellant believed that Lockett and Byrd had been involved in the fight outside the bar; words were exchanged and an altercation ensued. Id. at 259. During a break in the fighting, Byrd saw appellant point something at Lockett, and, next he heard a blast. As Byrd responsively dropped to the floor, he saw Lockett "fly down the steps." Id. at 260. Byrd darted down the stairs to Lockett, who had been shot in the forehead. A security officer, Chad Schell ("Schell"), was nearby and immediately *Page 3 
responded, as did a police officer with the Columbus Police Department ("CPD") who was also in the area. Byrd was eventually placed in the backseat of a police cruiser and interviewed. He was then driven in the cruiser to another location in the garage where a show-up was conducted. Byrd was shown and identified appellant as the shooter.
 {¶ 5} Kastaisja Brant ("Brant") testified that on the night in question, she and her friend, Tiara Scott ("Scott"), made plans to go on a double date; Brant was dating White and Scott was dating appellant. Brant picked the group up in her Honda Accord, and they went to Skye Bar. When the group left the bar at closing time, Brant exited first and ran to her car, which was parked in the adjacent garage, because she was cold. Scott called Brant on her cell phone and told her to bring the car down to a lower level of the garage and wait for the group. Scott and White met Brant at the Honda, and, while waiting for appellant, they looked down the stairwell and saw appellant getting beaten up. White went down the stairs to assist appellant. Brant lost track of Scott in the commotion. Brant testified that she next observed Scott's friend, Mieja Watson ("Watson"), drive up in a black Bravada. Brant saw appellant get out of the Bravada, holding a gun, which she then saw him discharge. After firing the gun, Brant testified that appellant got in the Honda's backseat. Brant testified that she was too "frantic" to drive, so Scott took the keys and drove the Honda toward the exit of the parking garage. Brant's car was stopped by Michael Chapman ("Chapman"), a police officer with the CPD for 22 years, who noticed the bullet hole in the car's rear window, as well as glass on the trunk. According to Brant, the Honda's rear windshield was not cracked prior to the gunshot.
 {¶ 6} Schell testified that he had broken up several fights that evening, including one involving an individual wearing a sleeveless white t-shirt, who was later identified as *Page 4 
appellant. Once the individuals involved in the fight were separated from each other, appellant yelled, "I'm going to kill you," at someone over Schell's shoulder, and then made the gesture of a gun with his thumb and index finger. Id. at 44. After the crowd dispersed, Schell left the scene, but returned soon after he heard a gunshot. There, he observed two vehicles, a black Bravada and silver Honda, and, inside the Honda, he noticed appellant. Schell radioed this information to other units so that those vehicles could be prevented from leaving the garage.
 {¶ 7} Sergeant Jim Barnes ("Barnes"), a police officer with the CPD for 18 years, had been at the scene that evening, breaking up fights in and around the Skye Bar and the adjacent garage. Barnes testified that he was in the garage when he heard a loud gunshot, and he ran toward the sound. Between the first and second floor of the stairwell in the garage, he found Lockett lying on the landing. Individuals in the area told Barnes that the shooter had left the scene in a black SUV, so he ordered the garage closed. After several black SUVs had been stopped, Barnes heard over the radio that the shooter "was still in the garage sitting in a Honda." Id. at 427. Barnes walked through the garage and found the Honda parked near the stairwell. As he approached, Barnes noticed "what appeared to be a bullet hole coming from the inside of the car out, [and] broken glass still on the trunk of the lid." Id. at 428. The occupants of the Honda were ordered out of the vehicle, including appellant who was situated in the backseat behind the driver, and another police officer took custody of appellant. The scene was then secured, the individuals removed from the car were separated, and homicide detectives were called to the scene to process the area. *Page 5 
 {¶ 8} One of the homicide detectives that arrived at the scene was Jay Fulton ("Fulton"), a 20-year veteran with the CPD. Fulton and his partner interviewed Byrd, who stated that he could identify Lockett's shooter, so they began to show Byrd possible suspects that had been detained in the garage. Appellant was the second suspect shown to Byrd, who positively identified appellant as the shooter. Fulton interviewed various witnesses at the scene, including White, Scott, and Watson. Fulton also interviewed appellant, who admitted that he had been beaten up earlier that evening. Fulton testified that appellant denied having heard a gunshot in the garage and also claimed that he was not aware that anyone had been shot. When Fulton asked appellant why he was not wearing a shirt, appellant told him that it had been ripped off during the fight, and he did not know what happened to it.
 {¶ 9} The day after appellant's interview, Fulton received and reviewed security camera videotape footage from the garage. The footage, which was shot from various angles and included the shooting, as well as events that transpired both before and after, was played for the jury. According to Fulton, the security footage depicted the altercation in the stairwell between appellant, Byrd, and Lockett, and, subsequently, showed appellant reaching into the Bravada and coming out with a handgun that he pointed toward the stairwell. Although no muzzle flash could be observed, people in the vicinity could be seen reacting to something by ducking down.
 {¶ 10} Fulton also provided testimony regarding the bullet's trajectory. He testified that he believed the bullet traveled through the Honda and struck the rear windshield before striking the trunk and hitting Lockett. Defense counsel questioned Fulton and attempted to elicit from him an admission that the trajectory of the bullet could not be *Page 6 
reconciled with appellant's physical location in relation to Lockett, thus suggesting that the state's theory of the case was not supported by the evidence. Fulton, however, explained that the bullet's travel path could have been affected by a number of factors, including "what kind of shot" appellant was, the angle he was standing at when he fired the gun, and his exact location in relation to Lockett and the stairwell, none of which were depicted with exact certainty on the security footage. Id. at 547.
 {¶ 11} Several officers with the CPD's Crime Scene Search Unit ("CSSU") also testified. One officer was Ted Manasian ("Manasian"), a forensic scientist with the CPD for 15 years. Manasian testified that he performed a gunshot residue test on appellant's hands, the result of which was that appellant's hands were positive for gunshot residue. Another officer with CSSU to testify was Janel Mead ("Mead"), a police officer with the CPD for 22 years. According to Mead, the bullet that killed Lockett had traveled through Brant's vehicle and "skidded" on its hood. Id. at 397. Mead testified that she was not sure whether or not the bullet had been fired from inside the vehicle, but, based upon the pattern of the crack to the vehicle's window, she believed the bullet had traveled through it. Mead also testified that, after the incident, Brant's vehicle was impounded, and, during an inventory search of the vehicle, a sleeveless white t-shirt stained with dried blood was found. With respect to the t-shirt, Chapman had testified that when he, along with Barnes, ordered the occupants of the Honda out of the vehicle, he observed a sleeveless white t-shirt tucked at the base of the driver's seat.
 {¶ 12} On January 30, 2008, the jury convicted appellant of aggravated murder with specification, tampering with evidence, and carrying a concealed weapon. The court *Page 7 
also convicted appellant of having a weapon under disability after a bench trial. The court sentenced appellant accordingly.
 {¶ 13} Appellant timely appealed and brings the following single assignment of error for our review:
 THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING APPELLANT GUILTY OF AGGRAVATED MURDER; TAMPERING WITH EVIDENCE; CARRYING CONCEALED WEAPON AND HAVING WEAPON UNDER DISABILITY AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 14} Appellant asserts in his assignment of error that the trial court's judgment was not supported by sufficient evidence and was against the manifest weight of the evidence. Although appellant's assignment of error references both concepts, he presents no argument that challenges the sufficiency of the evidence, nor does he argue that the state failed to produce evidence as to any element of the offenses of which he was convicted. Rather, the sole focus of appellant's argument is whether his conviction for aggravated murder is against the manifest weight of the evidence. We, therefore, have tailored our discussion to the argument presented by appellant. In doing so, however, we note that resolution of appellant's manifest-weight argument is also dispositive of sufficiency regardless. State v. Roberts (Sept. 17, 1997), Summit App. No. 96CA006462.
 {¶ 15} "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the *Page 8 
other." State v. Brindley, Franklin App. No. 01AP-926, 2002-Ohio-2425, at ¶ 16 (citation omitted). In order for a court of appeals to reverse the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court must disagree with the fact finder's resolution of the conflicting testimony.State v. Thompkins (1997), 78 Ohio St.3d 380, 387. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Id., quoting State v.Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 16} A defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was presented at trial.State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21. The determination of weight and credibility of the evidence is for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230. The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. State v.Williams, Franklin App. No. 02AP-35, 2002-Ohio-4503, at ¶ 58; State v.Clarke (Sept. 25, 2001), Franklin App. No. 01AP-194. The trier of fact is free to believe or disbelieve all or any of the testimony. State v.Jackson (Mar. 19, 2002), Franklin App. No. 01AP-973; State v.Sheppard (Oct. 12, 2001), Hamilton App. No. C-000553. Consequently, although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must give *Page 9 
great deference to the fact finder's determination of the witnesses' credibility. State v. Covington, Franklin App. No. 02AP-245, 2002-Ohio-7037, at ¶ 22; State v. Hairston, Franklin App. No. 01AP-1393, 2002-Ohio-4491, at ¶ 17.
 {¶ 17} Appellant was convicted of aggravated murder, which R.C. 2903.01(A) defines as follows:
 No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.
 {¶ 18} The gravamen of appellant's argument is that the state's case is contradicted by the physical evidence, specifically, the trajectory of the bullet that killed Lockett. Appellant contends that in order for his firearm to have discharged the bullet that killed Lockett, the bullet would had to have "made a large `C shaped trajectory," and such was a physical impossibility due to "relative positions of Appellant, Brant's car, and Lockett." (Appellant's brief at 3.) Appellant contends his version is supported by both the videotape, as well as Mead's testimony that the bullet strike to Brant's car was caused by a bullet that traveled "from inside the vehicle out." (Tr. 397.) Thus, according to appellant, the evidence offered at trial was both contradictory and entirely implausible, and, therefore, his conviction cannot stand.
 {¶ 19} A review of the record discloses that the issue of the bullet's trajectory was fully explored during trial. Indeed, defense counsel vigorously pursued questioning on this topic, and also devoted a substantial portion of closing argument to the same, using it to highlight what he perceived as the weakness of the state's case. The jury properly could have considered and drawn conclusions from the security footage, which depicted scenes related to the shooting. Also submitted to the jury for consideration was the *Page 10 
testimony of Detective Fulton, who gave several reasons to explain how and why the bullet may have traveled the path that it did. It was within the province of the jury to resolve the competing contentions regarding the bullet's trajectory and determine what weight to give to the state's evidence. DeHass, supra. In addition to the foregoing, the jury also had before it the testimony of Byrd, who stated that he saw appellant shoot Lockett, as well as Brant, who similarly testified that she saw appellant shoot a gun. The jury could view and weigh this evidence in any reasonable manner and find appellant guilty of aggravated murder.
 {¶ 20} After carefully reviewing the trial court's record in its entirety, we conclude there is nothing to indicate the trier of fact clearly lost its way or that any miscarriage of justice resulted. Consequently, we cannot say appellant's conviction is against the manifest weight of the evidence.
 {¶ 21} For the foregoing reasons, we overrule appellant's single assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
 BROWN and SADLER, JJ., concur. *Page 1