[Cite as *State v. Ham*, 2009-Ohio-3822.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## WYANDOT COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO. 16-09-01

    v.

DARLA M. HAM,                       O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Upper Sandusky Municipal Court

Trial Court No. CRB 08-00110A

**Judgment Affirmed in Part and Sentence Vacated in Part**

Date of Decision:    August 3, 2009

APPEARANCES:

    *David K. Goodin*  for Appellant

    *Kathryn M. Collins*  for Appellee

Case No. 16-09-01

**PRESTON, P.J.**

{¶1}  Defendant-appellant, Darla M. Ham (hereinafter "Ham"), appeals the Upper Sandusky Municipal Court's judgment of conviction and imposition of restitution.  For the reasons that follow, we affirm Ham's conviction but vacate the trial court's restitution order.

{¶2}  On March 13, 2007, an anonymous caller claiming to be one of Ham's neighbors reported to the Wyandot County Sheriff's Office that a dead dog was located in a chain-link-fenced area at Ham's residence. (Oct. 21, 2008 Tr. at 6-7).  When the sheriff's deputy arrived at Ham's residence, he found two dogs, a black Great Dane and a Jack Russell Terrier, that he determined were in very poor health.  (Id. at 7-8).

{¶3}  On March 18, 2008, two complaints were filed against Ham, each charging her with one (1) count of animal cruelty in violation of R.C. 959.13(A)(1), second degree misdemeanors. (Doc. No. 1).  The complaint in case no. CRB-08-110A involved Ham's black Great Dane. (Doc. No. 1).  The complaint in case no. CR-08-110B involved Ham's Jack Russell Terrier.[1]

{¶4}  On March 25, 2008, Ham filed a written plea of not guilty to the complaints and requested a pretrial. (Doc. No. 4).

---

[1] In her brief to this Court, Ham stated that a "complaint with two counts" was filed; however, upon review of the record, we find that the two charges were filed in separate complaints and given two different case numbers. (Appellant's Brief at iv). (Oct. 21, 2008 Tr. at 4, 104); (See, also, Doc. Nos. 1, 4, 5, 8, 10).

{¶5} Case numbers CR-08-110A and CR-08-110B were consolidated for purposes of trial. (See Doc. Nos. 28-34). On October 21, 2008 a bench trial was held wherein the trial court found Ham not guilty in case no. CR-08-110B, involving the Jack Russell Terrier, but guilty in case no. CR-08-110A, involving the black Great Dane. (Oct. 21, 2008 Tr. at 104-10); (Doc. No. 35). Ham was fined $100, ordered to pay court costs, sentenced to ninety (90) days in jail, with all days suspended, placed on probation for three (3) years, and ordered to perform twenty (20) hours of community service. (Doc. No. 35). The trial court further ordered that Ham forfeit the Great Dane to the Wyandot County Humane Society and that she pay restitution in the amount of $3,126.72. (Id.).

{¶6} On November 19, 2008, Ham filed a notice of appeal. (Doc. No. 45). This appeal was assigned appellate case no. 16-08-20 but was dismissed for lack of a final appealable order on December 8, 2008. (Doc. No. 53). On December 17, 2008, the trial court filed a nunc pro tunc entry, from which Ham filed another appeal on January 12, 2009. (Doc. Nos. 54, 57).

{¶7} Ham now appeals her conviction in case no. CR-08-110A raising two assignments of error for our review.

### ASSIGNMENT OF ERROR NO. I

**THE EVIDENCE IS INSUFFICIENT TO SUPPORT A CONVICTION UNDER ORC §959.13(A)(1) AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE THE STATE FAILED TO PROVE BEYOND A**

**REASONABLE DOUBT EACH ELEMENT OF THE OFFENSE.**

**{¶8}** In her first assignment of error, Ham argues that her conviction was based upon insufficient evidence and against the manifest weight of the evidence. Specifically, Ham argues that she was not the dog's caretaker but entrusted the feeding and watering of the dog to her sixteen-year-old daughter. Furthermore, Ham points out that, although no water was found with the dog, the evidence demonstrated that the dog had access to water. With regard to the dog's weight, Ham alleges that the dog had a history of being underweight because it consumed contaminated dog food. Ham also notes that the trial court did not rely upon any findings of fact relating to her failure to seek veterinary care for the dog.

**{¶9}** The State, on the other hand, argues that the evidence regarding the Great Dane's poor physical condition was "overwhelming." (Appellee's Brief at 4). The State also argues that Ham's failure to seek timely and critically necessary veterinary care is torture within the meaning of R.C. 959.13(A)(1). The State further argues that evidence presented demonstrated that the dog did not have access to food or water.

**{¶10}** As a preliminary matter, we note that Ham failed to move for a Crim.R. 29(A) judgment of acquittal. However, Ham was tried to the bench, and "[i]n [a] non-jury trial * * * the defendant's plea of not guilty serves as a motion for judgment of acquittal, and obviates the necessity of renewing a Crim.R. 29

motion at the close of all the evidence." *City of Dayton v. Rogers* (1979), 60 Ohio St.2d 162, 163, 398 N.E.2d 781, overruled on other grounds by *State v. Lazzaro* (1996), 76 Ohio St.3d 261, 667 N.E.2d 384. See, also, *State v. Stoner*, 2nd Dist. No. 2008 CA 83, 2009-Ohio-2073, ¶22 and *State v. Bidlack* (Oct. 16, 1987), 3d Dist. No. 11-85-8, at *1, both citing *Rogers*, 60 Ohio St.2d 162.

{¶11} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks* (1981), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds in *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668. Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.

{¶12} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that

the conviction must be reversed and a new trial ordered.'" *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212.

{¶13} At the bench trial, the State presented four witnesses. Deputy Dennis Wilson, a Wyandot County Sheriff's Deputy since 1992, testified that on March 13, 2008 an anonymous caller alleging to be Ham's neighbor reported that there was a dead dog in a chain-link-fenced area at Ham's residence. (Oct. 21, 2008 Tr. at 4-7). When Deputy Wilson arrived on the scene he started taking pictures of the dog, but the dog never moved until after he had taken two or three pictures of it. (Id. at 7). Wilson testified that the dog then picked its head up but never got up from lying down. (Id.). Wilson called the humane society and asked them to come to the scene and determine what should be done with the dog. (Id.). Wilson testified that the dog he photographed was a black Great Dane that was "very skinny, hips were showing, ribs were showing, [and] had a very large swollen leg that was hot to [the] touch." (Id. at 7-8). Wilson further testified that the humane society thought the dog was a very bad case, and that they had to carry the dog out of the pen. (Id. at 7). Wilson also testified that he located a Jack

Russell Terrier ("Terrier") in a smaller pen, approximately 10-15 square feet in size, and that the pen was muddy. (Id. at 8). Wilson testified that food dishes in its pen were full of water and leaves, and the water bucket was mostly full of ice. (Id.). According to Wilson, the Great Dane had an entrance into a building where there was accessible food, but the dog was not very ambulatory. (Id.). Wilson further testified that the Great Dane did not have access to the Terrier's pen, and that the Terrier did not have access to the building where the dog food was located. (Id. at 9).

{¶14} Deputy Wilson identified State's exhibit A as several photographs he had taken at Ham's residence, including a picture of Ham's mailbox showing the address to be located in Wyandot County, Ohio. (Id. at 9-10); (State's Ex. A). The photographs included: the dog's fenced-in area; the dead raccoon found in the Great Dane's pen; the Great Dane's leg and foot that appeared swollen and infected; an empty water bucket; the Terrier's pen with ice-filled water bucket; the building to which the Great Dane had access to food; pictures of the Great Dane standing; a note that he left at the residence for Ham; and vultures that had gathered on the Great Dane's pen. (State's Ex. A); (Oct. 21, 2008 Tr. at 9-16). Wilson further testified that the Terrier's ribs were showing, but that the humane society did not believe this dog needed immediate medical attention. (Id. at 13-14). Wilson testified that after the humane society arrived, the Great Dane stood

up in the same spot for about 10 minutes and then went about 10 to 20 feet to sniff the dead raccoon carcass. (Id. at 14-15). The Great Dane did not really place weight on the injured leg but did put it on the ground according to Wilson. (Id. at 15).

{¶15} Deputy Wilson testified that he was unable to contact Ham that day but was able to contact her at her place of employment a couple days later. (Id. at 16-17). Wilson identified Ham in open court. (Id. at 17). Wilson testified that he returned to Ham's residence on March 17th and found the Terrier's food dishes in the same condition, and that the dog appeared thinner but still not extreme. (Id. at 18).

{¶16} On cross-examination, Deputy Wilson testified that the Great Dane did not move until 10 to 15 minutes after he arrived on the scene and did not get up until after 30 to 45 minutes. (Id. at 19). Wilson testified that he noticed the dog's leg was swollen but did not notice any bite marks, and that he inspected the raccoon carcass. (Id. at 20). Wilson admitted that he remarked in his report that the Terrier was much healthier than the Great Dane. (Id. at 21). Wilson also admitted that there was dog food lying on the ground inside a building to which the Great Dane had access. (Id.). Wilson testified that the Great Dane urinated for approximately 10 minutes, and that "* * * a couple of pictures that [he] took of it, you could see it kind of squatting." (Id.). Wilson testified that when he asked Ham

about why the Great Dane was so skinny, she informed him that it was due to contaminated dog food that caused infections. (Id. at 22). Wilson testified that the Great Dane's pen was "very large" and "had room for other dogs." (Id. at 23). Wilson testified that the temperature the day of the incident was around 40 degrees, the snow was melting, and the ground was soft. (Id.).

{¶17} Anne Beaston, a Wyandot County Humane Society employee for over 10 years, testified that co-worker Mindy Vaughn and she went to help Deputy Wilson investigate the case at Ham's residence. (Id. at 25). Beaston testified that when she arrived she noticed that the Great Dane was lying on the ground and not getting up. (Id. at 26). Beaston further testified that she saw a bucket of food knocked over in the area but did not see any water. (Id.). Beaston testified that she entered the dog's fenced area, and that the dog "did try to stand up" but that "[i]t couldn't put a lot of weight on its foot so [she] knelt down, [she] felt its leg, [and] it was really hot." (Id.). Beaston testified that the dog remained sitting and did not stand up, so Mindy and she decided to drive the humane society van closer to load the dog. (Id. at 27). Beaston testified "[w]e tried to get it to walk and it couldn't and we picked the dog up and put it in the back of the * * * van." (Id.).

{¶18} On the other hand, Beaston testified that the Terrier appeared healthy, not underweight, and was jumping around in the pen. (Id.). She did not see any food for the Terrier, but the water it had was green with leaves in it,

though Beaston testified that she did not believe the Terrier was in immediate need of assistance. (Id.). "The Great Dane, however, wasn't able to stand, was very thin, in [her] opinion, and didn't look good. So [she] felt that dog needed immediate intervention to save its life." (Id.). Beaston identified State's exhibit B as several photographs she had taken of the Great Dane the day the dog entered the humane society's care. (Id. at 28-29); (State's Ex. B).

{¶19} On cross-examination, Beaston testified that the wounds found on the Great Dane appeared relatively new, and that the photographs were taken prior to the dog being cleaned. (Id. at 31-32). Beaston testified that she saw a dead raccoon in the dog's pen and admitted that the wounds could have been caused by the raccoon. (Id. at 32). Beaston also admitted that Ham had previously worked at the humane society, cleaning animal pens. (Id. at 33). Beaston testified that the Terrier appeared healthy, active, and was not underweight. (Id. at 34). Beaston further testified that the Great Dane swayed back and forth and was unable to stay standing. (Id. at 35). Beaston admitted that the Great Dane had access to the building where food was found. (Id.). On re-direct examination, Beaston testified that she did not see the dog walk around the pen. (Id. at 36). She also testified that she tried to coax the dog to walk to the van, but that every time, the dog would wobble and fall over. (Id.)

{¶20} Mindy Vaughn, an employee at the Wyandot County Humane Society for 6 years, testified that she helped Beaston investigate a complaint at Ham's residence on March 13, 2008. (Id. at 38). Vaughn testified that she went to the Great Dane's pen to see if he would walk; the dog got up but could not take even two steps and laid back down. (Id.). Vaughn testified that she gave Beaston a leash and moved the van closer to the dog's pen, but that the dog could not walk. (Id. at 39). Vaughn testified that the dog had "bite marks all down his * * * leg." (Id.). Vaughn testified that she did not see any water in the pen, but that she did not go into the building that was accessible from the dog's pen. (Id.).

{¶21} On cross-examination, Vaughn testified that she stated in her report that the dog came limping toward the fence. (Id. at 40). Vaughn testified that the dog was about 20 to 30 feet away from the fence, but the dog did not make it all the way to the fence. (Id.). Vaughn testified that the Terrier had water and was active and healthy. (Id. at 41). She testified that the dead raccoon was lying right beside the Great Dane, and that the dog could not walk due to his swollen leg. (Id.). On re-direct, Vaughn testified that the Terrier's water was green with leaves in it, but that she did not look for food in its pen. (Id. at 42).

{¶22} Dr. Jeff Heydinger, a veterinarian with over 30 years of experience and employed at the Wyandot County Humane Society, testified that he examined

the Great Dane when it was brought to the shelter on March 13, 2008. (Id. at 43, 44). Dr. Heydinger testified that:

> **\* \* \* [the dog's] leg was swollen, I would say, twice the size of a normal. The dog looked very thin, easy to see the ribs. Very weak. I didn't think the dog could stand. With a little help, we could get it to stand up. It had diarrhea. And the toes he had started some open wounds, abscess on his toes already.**

**{¶23}** (Id. at 45). Dr. Heydinger explained that an abscess is an infection and that "–especially if they start like a puncture wound—you may not see anything for a while. The skin seals over. The infection takes over and then when it gets to the point where there's enough pressure, the skin starts to die on top, then it'll open and drain out \* \* \*." (Id.). Dr. Heydinger opined that the Great Dane's injury was about a week to 10 days old. (Id.). Dr. Heydinger also testified that the dog weighed 84 pounds, which he estimated was 20 to 30 pounds less than it should have weighed. (Id. at 46). He testified that he gave the dog antibiotics and anti-inflammatory medication for at least a couple of weeks, and that the swelling began to go down about four to five days after the treatment began. (Id.). He further testified that the dog's condition would not have been as severe had veterinary treatment been provided earlier. (Id.). On a scale of one to six, one being emaciated and six being excessively overweight, Dr. Heydinger rated the Great Dane at two when it first arrived at the shelter and five at the time of the trial. (Id. at 46-47).

{¶24} Dr. Heydinger testified regarding his reports as well. He testified that beginning on March 13th he started antibiotics because of the infection, and because the dog had blood poisoning. (Id. at 47-48). On March 17th the dog began to eat more, but he was concerned that the leg wound would develop gangrene and the dog would lose tissue; however, the dog only lost some hair since the infection was under control. (Id. at 48). Around March 20th, the dog developed an upper respiratory infection, so from March 20th to March 27th he administered a different antibiotic since the dog was not responding as expected to the other antibiotic. (Id.). This new antibiotic was continued until April 2nd, and all antibiotics were discontinued beginning April 9th. (Id. at 49). On April 7th, the dog was reweighed at 94 pounds, and the dog's leg was almost back to normal size. (Id.). Dr. Heydinger also testified that the dog was given a flea and heart worm treatment, and that, on October 8th, the dog weighed 104.7 pounds. (Id. at 49-50). He did not believe the dog would have survived without proper medical care in the condition the dog was received by the humane society. (Id. at 51).

{¶25} Dr. Heydinger testified that in late June a shelter worker commented that the dog had a limp. (Id. at 49). He checked the dog and determined the limp was normal for his confirmation. (Id.). "Confirmation," according to Dr. Heydinger, is "body shape, uhm, probably * * * most obvious if a dog had real crooked legs, that's real obvious." (Id. at 50). Dr. Heydinger testified that the

Great Dane, "[h]e's – his front leg, he kind of, like, wings out a little at his elbow. And you can misinterpret that's as a limp, but that's just the way he's built." (Id.).

**{¶26}** On cross-examination, Dr. Heydinger testified that the respiratory infection developed while the dog was in the humane society's care for two weeks. (Id. at 51-52). He further testified that Aflatoxin is a mold-related problem that is in some feed that can cause various illnesses. (Id. at 52). He acknowledged that the mold releases a toxin that can affect the liver, kidneys, and digestive tract and can lead to weight loss. (Id. at 52-53). Dr. Heydinger further testified that he remembered hearing about a recall on Diamond dog food because it tested positive for Aflatoxin. (Id. at 53). He testified that a dog's saliva does not naturally heal wounds, though the dog can keep a wound clean by licking it. (Id. at 55). Dr. Heydinger also testified that the abscesses on the dog's feet would not normally be seen without actually separating the dog's toes. (Id. at 55-56). On re-direct, he testified that he had spread the dog's toes because the feet were swollen. (Id. at 56). He further testified that Aflatoxin did not cause the injuries to the dog's leg. (Id.).

**{¶27}** Thereafter, the State rested, and the defense called three witnesses. (Id.). Jessica Ham testified that Darla Ham was her mother, and that she lives with her mother. (Id. at 57). Jessica testified that she and her brother fed and watered the Great Dane and Terrier every day. (Id. at 58). She testified that, on March

13th, she arrived home from play practice after dark and went to feed and water the Great Dane but could not find him. (Id.).  She said she went to the kennel and was walking around when she tripped over something; she went down to touch it, and discovered it was not the dog but a dead raccoon. (Id. at 59).  She testified that she had not seen the raccoon before even though she had been in the pen earlier that day and the prior evening. (Id.).  When asked if the raccoon was a fresh carcass, she testified, "I don't know.  It was dark.  And when I tripped over it it was kind of gooey, so I'm guessing, so – because – yeah – it was pretty gross." (Id.).  Jessica also testified that she saw the Great Dane the day before and did not see any wound on the dog's leg. (Id. at 60).  Jessica testified that she fed the Great Dane inside a building where the dog had access, but fed the Terrier in its separate kennel. (Id.).  Jessica further testified that she would carry dog food to the building from the back porch in a bucket. (Id. at 61).  She testified that she found the food and water buckets spilled over, and water and food was all over the ground in the building. (Id. at 61-62).  Jessica testified:

> **So, like, I knew there used – like, it was completely full, like, if I were to, like, put everything back in the buckets, you could tell that they were full.  Somebody must have dumped them or maybe the dog did and that's why I was concerned and that's why I went to go look for him because when I called he didn't come.  I was like, that's weird, his buckets are knocked over, he's not in the kennel, it's nighttime, usually he's sleeping now.**

**{¶28}** (Id. at 62). Jessica testified that they used multiple dishes for food and water because it was winter time. (Id. at 63). She testified that there was melting snow on the ground, and that the one water bowl was frozen. (Id.).

**{¶29}** On cross-examination, Jessica testified that it was dark when she came home from play practice so she had to use a flashlight to check on the dog. (Id. at 64). She testified that she carried the dog food from inside the house to the building in probably a five gallon bucket. (Id. at 64-65). She testified that they use multiple buckets and switch them as needed if they become muddy. (Id. at 65). She testified that she filled the five gallon bucket full of dog feed everyday, but the dog did not eat the whole bucket full of food each day. (Id.). Jessica testified that her and her brother made sure that the bucket is full of food everyday and provide fresh food everyday. (Id. at 66). She also testified that she filled up a five gallon bucket of water every day for the dog. (Id.) Jessica testified that they use little food buckets for the Terrier, but that she carries the five gallon bucket of food into the kennel and dumps some out into its food pans. (Id. at 67). She testified that she has been taking care of the dog ever since they owned him. (Id.).

**{¶30}** Jessica further testified that they had several more dogs before, but these dogs died because of bad dog food. (Id. at 68). She testified that her mother used to breed Great Danes, but that she was responsible for feeding and watering the animals. (Id.). She testified that they owned a Harlequin Great Dane, which

died because it was older, and another dog named Nemo who also died because of bad dog food. (Id. at 69). Jessica testified that, in total, five dogs died as a result of the bad dog food they purchased, which was a year or two ago. (Id.). She testified that she did not observe any fresh wounds or infection on the dog's leg and that she ran and played with the dog every day. (Id. at 69-70).

{¶31} Lee Newman testified that he has dated Ham for a little over two years and was familiar with the Great Dane and Terrier. (Id. at 71). He testified that he used to purchase dog food for Ham and would help feed and water the dogs if Ham asked him. (Id.). Newman identified defendant's exhibit 1 as receipts from the dog food he purchased from January 8, 2008, February 9, 2008, and March 10, 2008. (Id. at 72). He testified that he purchased 40 to 50 pounds of dog food per month prior to the Great Dane being removed, and that this food was being fed to the dog. (Id.). Newman testified that Ham's daughter was responsible for feeding the dog. (Id. at 73). He testified that he saw the dog a few days prior to March 13th, and the dog appeared fine and did not have any wounds. (Id.). Newman testified that: Ham's daughter feeds the dog after she arrives home from school; the dog food was kept in a garbage pail on the back porch; and Ham's daughter fed and watered the dog every day using a five gallon bucket. (Id. at 74). Newman also testified that the Terrier appeared to be healthy to him—proper weight and active—and that he did not observe any wounds on the dog. (Id. at 75). On cross-

examination, Newman testified that he did not own any dogs, and he was not at Ham's residence every day. (Id. at 76). He admitted that he could only testify that on days he was at the residence the dogs had been fed. (Id.).

{¶32} Darla Ham testified that she owns the Great Dane and the Terrier, and that on March 13th the Great Dane was removed from her property. (Id. at 77). She testified that she never observed any swelling or injuries on the dog's leg, and she saw it every day when she came home from work. (Id.). She admitted that she did not go into the dog's kennel but observed the dog from about 30 feet away. (Id. at 78). Ham further testified that the dog appeared active and was walking normal as far as she could tell. (Id.). Ham testified that on March 13th her daughter informed her that she could not find the dog, and that she found a dead raccoon in the dog pen. (Id. at 79). Ham testified that her daughter fed the dog on a daily basis by retrieving the food from the home as previously testified. (Id. at 80). Ham testified that the Great Dane had always had a weight issue, which she attributed to Diamond dog food. (Id. at 80-81). She testified that she used to have a pallet of dog food (fifty two, fifty-pound bags) delivered to her home at a time, but the last pallet of food was recalled due to Aflatoxin. (Id. at 81). Ham testified that the Great Dane, as well as her other dogs, had been eating this recalled food. (Id.). Ham testified that her other dogs had died as a result of this

contaminated food, and that the food caused the dogs to get really sick. (Id. at 81-82).

**{¶33}** Ham further testified that she worked at the humane society for a couple years but left because she disagreed with their policies. (Id. at 82). She testified that the humane society would hide dogs from their owners, and that they would not return the animal even if it had tags. (Id. at 83). Ham testified that she was fired from the humane society because she objected to these practices. (Id.). Ham testified that the humane society had expressed concerns over the Great Dane's weight about three (3) months prior to removing him, and she informed them that she was trying to slowly put weight on the dog by using different types of dog food. (Id. at 84-85). Ham testified that after she switched dog food, the dog started to gain weight. (Id. at 85-86).

**{¶34}** On cross-examination, Ham testified that she bred Great Danes about four years ago, and that several dogs died around 2005 when she had trouble with the Diamond dog food. (Id. at 86-87). Ham testified that a couple of dogs and puppies died as a result. (Id. at 87). She testified that she was provided with a replacement pallet of Diamond dog food for the recalled food, but that she did not feel comfortable using this food. (Id. at 88). Ham testified that her boyfriend began buying Old Yeller dog food at Kroger beginning about a year prior to the incident. (Id.). She further testified that she was trying new types of dog food,

including Pamida dog food, to see which food worked the best. (Id.). Ham testified that she thought the Great Dane gained weight using the Old Yeller dog food. (Id. at 89). Ham testified that she believed the dog had continuing health issues related to the Aflatoxin from the Diamond dog food, but she did not take him for veterinary care. (Id.). Ham acknowledged receiving the note from Deputy Wilson, and testified that she went to the sheriff's department but that he was not there. (Id. at 90). Ham also admitted that she only saw the dog on her way into the house from work, and it was usually dark outside when she finished work. (Id. at 90-91). On re-direct, Ham identified defense exhibit 2 as receipts for the Diamond dog food she purchased as well as a recall notice for the food. (Id. at 91-92). Ham testified that the Great Dane and Terrier ate the tainted food. (Id. at 92).

{¶35} Thereafter, the defense rested and the State called Ann Beaston for rebuttal. (Id. at 93). Beaston testified that the Great Dane was currently in good health, had no marks on its legs, had gained weight, and was able to walk. (Id. at 94). She further testified that the dog was eating well. (Id.). Beaston identified State's exhibit C as pictures she had taken of the dog the day prior to her testimony. (Id. at 95). She testified that the dog was outside running around the yard, able to stand and lie down, and was much fuller in his face and body. (Id.).

**{¶36}** After hearing the testimony and reviewing the exhibits, the trial court found Ham guilty of animal cruelty with regard to the black Great Dane, case no. CRB-08-110A, and stated:

> **First, we're going to look at the Great Dane. And I – I think it's significant, at least in my mind it is, concerning the relationship between the defendant and the dog in question, that at no time did the Court ever hear these dogs referred to by name.**
>
> **The statute provides for a number of acts, error, omission or commission which constitute [sic] cruelty to animals, torturing, depriving of sustenance, and confining without sufficient quantity of good wholesome food and water are the three areas of the -- of the Court's concern in these cases.**
>
> **Those were the elements which were touched on by the prosecutor.**
>
> **\* \* \***
>
> **The Court read with interest the cases which were cited by the State and found them most instructive in dealing with the situation.**
>
> **The _Dresbach_ case the Court allowed a finding of torture through neglect sustained as adequately supported by the evidence. In other words, what that Court found was that torture can consist of, uhm, passive acts, or neglect, as well as active cruelty towards -- towards a creature.**
>
> **Now, in this case the Court finds this particular dog, the Great Dane, to have been grossly neglected and allowed to suffer needlessly.**
>
> **The Court was particularly impressed by the medical testimony of Dr. Heydinger. Doctor Heydinger testified that the wounds in question were approximately 10 days old, and he provided adequate medical reasons why he was of such an opinion.**
>
> **The Court noted from the photographs that the wounds did not appear to be, uhm, fresh in the way that the -- the defendant characterized them as fresh. They appeared to be open. They appeared to be angry and there had certainly been adequate time for the swelling to develop.**

Uhm, in addition, the doctor testified that the abscesses between the toes which did exist had began to seep, which was additional evidence in his -- in his mind and formulated his opinion, that such wounds were not of recent vintage, but had been there for some time. The testimony I believe was that the wounds were approximately 10 days old, 7 to 10, I believe the doctor said.

Now, the Court notes that Ms. Ham attributed the wounds to, uhm, a possible raccoon bite within the previous days this is contrary to the medical testimony. And the Court found also the testimony of the deputy in this regard and the testimony of the defendant's daughter to be instructive. The deputy testified that the raccoon that he observed was rotted, and defendant's daughter testified that it was "gooey" as the -- as they observed it in the dog's pen.

So the Court finds that this raccoon had not gotten in the pen, the dog had not fought with this raccoon within the previous day and sustained such bites in that -- in that way. It may well have been the raccoon but it certainly wasn't within the previous day.

The Court finds that by reason of its injuries, which went untreated for what the Court considers to be an unreasonable period here that the dog was allowed to suffer needlessly which the Court finds come [sic] within the definition of torture.

The Court also finds that the dog was confined without sufficient quantity of food and water which it could adequately reach, given its physical condition.

The Court noted that the defendant attributed it's [sic] emaciated condition to - - to the eating problem caused by Aflatoxin. However, that occurred approximately one to two years before.

The Court notes further that from the testimony of the shelter workers, and from Dr. Heydinger, that after the dog had begun to be properly fed, it gained substantial weight in the shelter and has regained its health.

The Court further finds the defendant was reckless regarding the care, or lack thereof, of this particular dog. And in the Court's mind could not have help but notice the emaciated condition of the dog, or the condition of its leg had she but looked. Failed to provide any adequate care for the dog, failed

**to provide treatment for the dog, deprived it of necessary -- necessary sustenance and confined it without sufficient food and water that the Court had previously found.**

(Id. at 105-09).

**{¶37}** Ham now appeals the trial court's finding of guilt in case no CRB-08-110A, involving the black Great Dane. As a preliminary matter, however, Ham noted that the trial court "did not rely upon any findings of fact relating to [her] failing to seek veterinary care for [the Great Dane]." (Appellant's Brief at 3). A simple reading of the transcript, cited above, refutes Ham's assertion. In any event, Ham's contention is irrelevant since she was tried to the court, and the trial court was not required to make findings of fact. *Struthers v. Williams*, 7th Dist. No. 07 MA 55, 2008-Ohio-6637, ¶24, citing Crim.R. 23(C)[2]. In fact, any purported findings of fact by the trial court are "mere surplusage without legal significance." *State v. Crawford* (Feb. 6, 1986), 10th Dist. No. 85AP-324, at *7. On the other hand, "there is no rule preventing [an appellate court] from considering the trial court's specific factual findings when reviewing a conviction to see whether it is against the manifest weight of the evidence." *Williams*, 2008-Ohio-6637, at ¶24. With that clarification, we now proceed to our analysis.

**{¶38}** R.C. 959.13(A)(1) provides:

**(A)     No person shall:**

---

[2] Crim.R. 23(C) provides: "[i]n a case tried without a jury the court shall make a general finding."

**(1)   Torture an animal, deprive one of necessary sustenance, unnecessarily or cruelly beat, needlessly mutilate or kill, or impound or confine an animal without supplying it during such confinement with a sufficient quantity of good wholesome food and water;**

**{¶39}** .C. 959.13(A)(1) is not a strict liability offense; rather, the State must show that the defendant acted recklessly. *State v. Bergen* (1997), 121 Ohio App.3d 459, 461, 700 N.E.2d 345, citing *State v. Myers* (1993), 87 Ohio App.3d 92, 621 N.E.2d 881, and *State v. Lapping* (1991), 75 Ohio App.3d 354, 599 N.E.2d 416. R.C. 2901.22(C) provides that:

**A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.**

**{¶40}** After reviewing the evidence presented above, we cannot conclude that Ham's conviction was against the manifest weight of the evidence.  To begin with, all the State's witnesses testified that the Great Dane was extremely emaciated and weakened to the point that it could not remain standing without assistance.  Deputy Wilson testified that the dog's ribs and hip bones were readily visible. (Oct. 21, 2008 Tr. at 7-8, 26-27, 38-39).  In fact, the dog had to be carried out of the pen for veterinary care. (Id.).  Aside from the testimony, several pictures taken of the dog by Deputy Wilson at Ham's residence were admitted into

evidence. These pictures reveal a dog that is underweight and has many bones protruding. (State's Ex. A). Dr. Heydinger also testified that, when the dog arrived at the humane society, it weighed 84 pounds, which he thought was about 20 to 30 pounds underweight. (Oct. 21, 2008 Tr. at 46-47). Dr. Heydinger gave the dog a score of "two" on a one-to-six scale, one being emaciated and six being excessively overweight. (Id.). After less than one month (Mar. 13 to Apr. 7) of veterinary care, the dog gained 10 pounds, and by October 8th, the dog weighed 104.7 pounds. (Id. at 49-50). Aside from this testimony, the trial court had several photographs taken at the humane society when the dog was initially brought there, which depict a very thin, emaciated dog with many bones protruding through its coat. (State's Ex. B). The trial court also had pictures of the dog after its veterinary treatment at the humane society, and the dog looks much healthier and heavier in these pictures. (State's Ex. C). From this evidence, the trial court could have reasonably concluded that the dog was not being provided a sufficient quantity of wholesome food. With regard to the evidence that the dog had food provided in the building attached to the dog's pen, the trial court specifically found that the dog did not have access to the food given his physical condition, and the evidence in the record supports this finding as well. (Oct. 21, 2008 Tr. at 108).

{¶41} Ham argues that the evidence demonstrated that the dog did have access to water since Deputy Wilson testified that he witnessed the dog urinate for

over ten minutes. While Ham's recollection of the testimony is correct, that does not mean the dog had access to a sufficient quantity of good, wholesome water. Deputy Wilson testified that the ground was covered with melting snow and mud; thus, the dog might well have obtained water from eating snow or drinking water from water puddles in its pen. (See id. at 22); (State's Ex. A). Furthermore, that the dog had access to water is insufficient, it must have access to sufficient quantities of *both* food and water under the statute. R.C. 959.13(A)(1). Since the evidence supported finding that the dog was not provided with a sufficient quantity of good, wholesome food, it is irrelevant whether or not it was provided with water.

{¶42} Ham also argues that the State failed to show that she acted recklessly in failing to provide a sufficient quantity of good, wholesome food. We disagree. The evidence here demonstrates that Ham was aware of the dog's emaciated condition and irrationally attributed the dog's continued condition to tainted food the dog ate three years ago. (See Oct. 21, 2008 Tr. at 81-82, 84-85, 89). In fact, Ham testified that the humane society expressed concern to her about the dog's weight in December 2007, almost three months prior to the dog being removed; and yet, Ham continued to do nothing. (Id. at 89). This fact makes this case distinguishable from *State v. York*, cited by Ham. 11th Dist. No. 97-L-037, at * 4 (noting that defendant was never informed about the animal's malnourished

state).  At a minimum, Ham acted recklessly when she failed to ensure that the dog was being properly fed by her children—a fact that she was aware of given the dog's condition.  Nor did Ham ensure that the dog's food was not being eaten by other wild animals, such as raccoons, even though one was found rotting in the dog's pen. (Id. at 32).  Ham testified that often times she saw the dog on her way into the house after work when it was dark outside and from a distance of 20 to 30 feet away. (Id. at 90-91).  Finally, Ham's bald assertion that the dog's emaciated condition was a result of contaminated food he ate in 2005 is undermined by the fact that the dog gained over 20 pounds while in the humane society's care. (Id. 49-50); (State's Ex. C).  Under these circumstances, we cannot conclude that the trial court's finding of guilt was against the manifest weight of the evidence on this basis either.

**{¶43}** Based upon all the evidence presented, Ham's conviction for endangering animals under R.C. 959.13(A)(1) was not against the manifest weight of the evidence.  Since any one of the grounds stated in R.C. 959.13(A)(1) is sufficient to sustain a conviction for animal cruelty, and Ham's conviction based upon her failure to provide a sufficient quantity of good, wholesome food and water was not against the manifest weight of the evidence,  the trial court's discussion of Ham's failure to seek veterinary care is superfluous and we need not consider it.  Further, since we have found that Ham's conviction was not against

the manifest weight of the evidence, we also find that Ham's conviction was supported by sufficient evidence. *State v. Sidders*, 3d Dist. No. 14-08-24, 2009-Ohio-49, ¶42, citing *State v. Rutledge* (June 1, 2001), 2nd Dist. No. 18462 at *3; *State v. Mitchell*, 5th Dist. No. CT2006-0090, 2007-Ohio-5519, ¶66; *State v. Bergsmark*, 6th Dist. No. L-03-1137, 2004-Ohio-5753, ¶8; *State v. Stubbs*, 8th Dist. No. 89883, 2008-Ohio-5983, ¶7; *State v. Adams*, 9th Dist. No. 07-CA-0086, 2008-Ohio-4939, ¶66; *State v. Jones*, 10th Dist. No. 08AP-260, 2008-Ohio-6963, ¶14; *State v. McCrory*, 11th Dist. No.2006-P-0017, 2006-Ohio-6348, ¶40; *State v. Wilkins*, 12th Dist. No. CA2007-03-007, 2008-Ohio-2739, ¶22.

**{¶44}** Ham's first assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. II

**IN PLAIN ERROR, THE TRIAL COURT EXCEEDED ITS AUTHORITY IN ORDERING RESTITUTION TO THE WYANDOT COUNTY HUMANE SOCIETY FOR EXPENSES OTHER THAN PROPERTY DAMAGE IN VIOLATION OF ORC §2929.21(E).**

**{¶45}** In her second assignment of error, Ham argues that the trial court exceeded its authority by ordering her to pay restitution to the Wyandot County Humane Society for costs it incurred for treating her dog. Ham argues that expenses related to the dog's care are not "property damage" within the meaning of R.C. 2929.21(E), citing several cases in support of that interpretation. In her reply brief, however, Ham acknowledges that R.C. 2929.21 was repealed by H.B.

490, eff. 1-1-04, and that her citation thereto was in error. In her reply brief, Ham now argues that the trial court's restitution order under R.C. 2929.28(A)(1), the new financial penalties section, was in error based upon *State v. Angus*, 10th Dist. No. 05AP-1054, 2006-Ohio-4455. We, therefore, will address Ham's arguments as they relate to the new statute and corresponding case law cited in her reply brief, not the former statute and case law cited in her original brief. We agree with Ham that the trial court erred in ordering her to pay restitution to the humane society.

**{¶46}** We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Landrum* (1990), 53 Ohio St.3d 107, 110, 559 N.E.2d 710, quoting *State v. Long* (1978) 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus. For plain error to apply, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right. *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240. Under the plain error standard, the appellant must demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors. *State v. Waddell* (1996), 75 Ohio St.3d 163, 166, 661 N.E.2d 1043, citing *State v. Moreland* (1990), 50 Ohio St.3d 58, 552 N.E.2d 894.

{¶47} R.C. 2929.28 governs the financial sanctions, including restitution, which courts may impose upon misdemeanor offenders. R.C. 2929.28(A)(1) provides, in pertinent part:

> **Unless the misdemeanor offense is a minor misdemeanor or could be disposed of by the traffic violations bureau serving the court under Traffic Rule 13, restitution by the offender *to the victim of the offender's crime or any survivor of the victim*, in an amount based on the *victim's economic loss*. \* \* \* If the court requires restitution, the court shall order that the restitution be made to the *victim* in open court or to the adult probation department that serves the jurisdiction or the clerk of the court on behalf of the *victim*.**
>
> **If the court imposes restitution, the court shall determine the amount of restitution to be paid by the offender. If the court imposes restitution, the court may base the amount of restitution it orders on an amount recommended by the *victim*, the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information, provided that the amount the court orders as restitution shall not exceed the amount of the economic loss *suffered by the victim* as a direct and proximate result of the commission of the offense. If the court decides to impose restitution, the court shall hold an evidentiary hearing on restitution if the offender, *victim*, or *survivor* disputes the amount of restitution. If the court holds an evidentiary hearing, at the hearing the *victim or survivor* has the burden to prove by a preponderance of the evidence the amount of restitution sought from the offender.**

{¶48} (Emphasis added). Although this Court has not interpreted R.C. 2929.28(A)(1), we have interpreted R.C. 2929.18(A)(1), which contains very similar language, and determined that the General Assembly intended restitution be available only to actual victims of the offense. *State v. Toler*, 174 Ohio App.3d

335, 2007-Ohio-6967, 882 N.E.2d 28, ¶12, citing *State v. Christy*, 3d Dist. No. 16-04-04, 2004-Ohio-6963, ¶16, citing *State v. Samuels*, 4th Dist. No. 03CA8, 2003-Ohio-6106, ¶5.   We have also found that, except under certain specified circumstances, governmental entities are not 'victims' entitled to restitution for their expenditure of public funds for fighting crime. *Toler*, 2007-Ohio-6967, at ¶11, citing *State v. Pietrangelo*, 11th Dist. No. 2003-L-25, 2005-Ohio-1686, ¶¶15-17.   Our reasoning in *Toler* and *Christy*, supra, is persuasive here because R.C. 2929.28(A)(1)'s plain language also allows "restitution by the offender *to the victim of the offender's crime or any survivor of the victim*, in an amount based on the *victim's* economic loss." (Emphasis added).   Therefore, we hold that trial courts have authority to order restitution under R.C. 2929.28(A)(1) *only to* the actual victim(s) of the offense or survivor(s) of the victim in accord with the statute's plain language.

**{¶49}** The trial court sub judice ordered that Ham pay $3,126.72 in restitution. (Dec. 17, 2008 JE, Doc. No. 54).  This amount was exactly equal to the costs incurred by the Wyandot County Humane Society for the care of Ham's dog, including: food and board, transportation, veterinary evaluations, vaccinations, and other administered medications. (Oct. 21, 2008 Tr. at 112); (State's Ex. D). Pursuant to R.C. 2929.28(A)(1), the trial court ordered that restitution be paid to

the probation department on behalf of the humane society. (See Dec. 17, 2008 JE, Doc. No 54); (Oct. 21, 2008 Tr. at 117-18).

**{¶50}** We, however, find that the trial court lacked authority under R.C. 2929.28 (A)(1) to order restitution to the humane society. The Wyandot County Humane Society was not a victim of Ham's crime or a survivor of the victim as those terms are used in R.C. 2929.28(A)(1). Furthermore, this Court has previously determined that county humane societies were established primarily for law enforcement—traditionally a governmental function—and therefore, should be considered political subdivisions for purposes of immunity under R.C. Chapter 2744. *Studer v. Seneca County Humane Society* (May 4, 2000), 3d Dist. No. 13-99-59, at *3. Accordingly, as governmental entities, humane societies are not 'victims' under the statute, unless otherwise specifically provided. *Toler*, 2007-Ohio-6967, at ¶11, citing *Pietrangelo*, 2005-Ohio-1686, at ¶¶15-17. Additionally, the Court of Appeals for the Tenth Appellate District has found that R.C. 2929.28(A)(1) does not authorize restitution to a humane society for the cost of care of animals seized under R.C. Chapter 959. *State v. Angus*, 2006-Ohio-4455, at ¶¶29-32. The Court in *Angus* premised its decision on the statute's plain language, and, for that reason, we find it persuasive here. Id. at ¶¶31-32. For all these reasons, we find that the trial court erred in ordering restitution to the Wyandot

County Humane Society and vacate that portion of the trial court's judgment entry of sentence.

{¶51} As a practical matter, although we have found no statutory authority under R.C. 2929.28(A)(1) for a trial court to order restitution to a humane society for costs it incurs for caring for animals seized under R.C. Chapter 959, R.C. 959.13(C) provides:

> **All fines collected for violations of this section shall be paid to the society or association for the prevention of cruelty to animals, if there be such in the county, township, or municipal corporation where such violation occurred.**

{¶52} Thus, humane societies are not without *any* recourse for the costs they incur. Nonetheless, because the trial court does not have authority to order restitution to the humane society under R.C. 2929.28(A)(1), Ham's second assignment of error is sustained.

{¶53} Having found no error prejudicial to the appellant herein as to assignment of error one, we affirm the trial court's judgment of conviction. Having found error prejudicial to the appellant as to assignment of error two, we vacate the trial court's restitution order.

*Judgment Affirmed in Part and*
*Sentence Vacated in Part*

**WILLAMOWSKI and ROGERS, J.J., concur.**
**/jlr**

Case No. 16-09-01