[Cite as *State v. Warner*, 2021-Ohio-4182.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,             CASE NO. 9-21-15

    v.

JASON D. WARNER,                 O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 2020CR0346

Judgment Affirmed

Date of Decision:  November 29, 2021

APPEARANCES:

    *Samuel H. Shamansky* for Appellant

    *Andrea K. Boyd* for Appellee

Case No. 9-21-15

**PER CURIAM.**

{¶1} Defendant-appellant, Jason Warner ("Jason"), brings this appeal from the April 16, 2021, judgment of the Marion County Common Pleas Court sentencing him to twenty-four months in prison after he was convicted in a bench trial of "Leaving the Scene of an Accident/Complicity" in violation of R.C. 2923.03(A)(2) and R.C. 4549.02(A)(1)/(B)(2)(b),[1] a fourth degree felony, and "Tampering with Evidence/Complicity" in violation of R.C. 2923.03(A)(2) and R.C. 2921.12(A)(1), a third degree felony. On appeal, Warner argues that there was insufficient evidence presented to convict him, that his convictions were against the manifest weight of the evidence, that the trial court's general findings of guilt constituted a legal impossibility, that the trial court committed repeated misconduct depriving him of a fair trial, and that if no single error was prejudicial, the cumulative effect of the trial court's errors was prejudicial.

*Background*

{¶2} On June 4, 2020, just after midnight, the record indicates that Jason's wife, Julia Warner ("Julia"), was driving a black Jeep Wrangler southbound on SR 203 with Jason in the passenger seat. At the same time, Colton G. was driving

---

[1] Pursuant to R.C. 4549.02(B)(1), a person who violates R.C. 4549.02(A) is guilty of "failure to stop after an accident." However, in the indictment the State titled the crime "Complicity to Leaving the Scene of an Accident." In addition, the trial court used the terminology "Leaving the Scene of an Accident/Complicity" in its final judgment entry. Notably, the Supreme Court of Ohio has colloquially called a violation of R.C. 4549.02 "leaving the scene of an accident." *State v. Bryant*, 160 Ohio St.3d 113, 2020-Ohio-1041, ¶ 2. We will use the terms interchangeably in this opinion.

-2-

northbound on SR 203 in a BMW X3. As both vehicles approached CR 106, also known as Somerlot Hoffman Road, Julia attempted to make a left turn onto CR 106 without yielding to Colton's vehicle. The Warners' Jeep Wrangler struck the left front of Colton's BMW, causing the BMW to travel off the right side of the road and strike a utility pole. The wreck resulted in serious damage to Colton's vehicle and trapped him, semi-conscious, inside.

{¶3} Some nearby residents in the rural area heard the crash and saw a male and female—the Warners, who were not known to the witnesses—walking around the crash site and looking into the damaged BMW. Julia was observed to have her hand over her mouth by one witness. Shortly thereafter, the witnesses saw the black Jeep Wrangler drive away from the scene of the accident prior to the arrival of law enforcement.

{¶4} One of the nearby witnesses approached the scene after the Jeep Wrangler left and saw that Colton's vehicle was smoking and noisy. Colton himself was trapped in his vehicle, bloody, and semi-conscious. One witness called 911 and emergency services responded. Colton had to be extracted from his vehicle with a "hydraulic spreader," also known as the "jaws of life," before being taken to the hospital.

{¶5} Meanwhile, the Warners went home, leaving marks in the roadway and their driveway where the vehicle's rim was scraping the pavement through a

deflated tire. A neighbor of the Warners was out walking and heard their vehicle making a lot of noise coming up the street. He saw the Warners' Jeep pull into their garage and close the door, though the neighbor did not see who was driving.

{¶6} The Warners did not contact anyone regarding the accident until approximately nine hours later, when they approached law enforcement together to accept responsibility for the accident. At that time, and over the ensuing weeks, Julia made multiple statements indicating that she was driving during the accident, that she thought there was a stop sign in the other direction, and that she misjudged the turn in the dark and the rain. When law enforcement investigated the matter, virtually all of the evidence pointed to Julia driving at the time of the crash, such as the bruising on her body consistent with the driver's-side seatbelt, her DNA on the driver's-side airbag, and Jason's DNA on the passenger's-side airbag. As for his part, Jason initially told a coworker that he had basically been "passed out" or "asleep" through the whole incident, though he later acknowledged to the same coworker that he had gotten out of the Jeep Wrangler at the scene, as other witnesses had claimed.

{¶7} On September 9, 2020, a joint indictment was filed against Jason and Julia alleging that they had each individually committed Complicity to Vehicular Assault in violation of R.C. 2923.03(A)(2) and R.C. 2903.08(A)(2)(b), a felony of the fourth degree (Count 1); Complicity to Vehicular Assault in violation of R.C.

2923.03(A)(2), R.C. 2903.08(A)(2)/(b), and R.C. 4549.02(A)(1), a felony of the third degree (Count 2); Complicity to "Leaving the Scene of an Accident" in violation of R.C. 2923.03(A)(2) and R.C. 4549.02(A)(1), a felony of the fourth degree (Count 3); and Complicity to Tampering with Evidence in violation of R.C. 2923.03(A)(2) and R.C. 2921.12(A)(1), a felony of the third degree (Count 4).[2] Jason and Julia pled not guilty to the charges. They also waived a jury trial and elected to proceed to a bench trial, with a visiting judge assigned to preside over the matter.

{¶8} Prior to trial, the parties entered into a number of stipulations, which included the authenticity of various lab reports, photographs, medical records, phone records, etc.[3] In addition, the Warners also agreed to stipulate that Colton suffered serious physical harm as a result of the accident, obviating the need for testimony from a significant number of medical professionals.

{¶9} The Warners' bench trial was held March 8-10, 2021. Importantly, the two charges for Complicity to Vehicular Assault against Jason were dismissed, though Vehicular Assault charges remained pending against Julia as the driver of the vehicle at the time of the accident.[4] At the conclusion of the trial, the trial court

---

[2] The indictment was amended to correct typos and incorrect numbers in portions of code sections.

[3] The Warners also waived any objections to proceeding to trial together after the issue was raised by the State.

[4] The State requested the dismissal of Complicity to Vehicular Assault charges against Jason after a review of the evidence and after speaking with the witnesses in preparation for trial. The State was satisfied that Julia was driving at the time of the crash, thus the State also requested the removal of "Complicity" language from her Vehicular Assault charges. The State's requests were not opposed and they were granted.

noted that it did not have to provide any reasoning to support its general findings; nevertheless, the trial court made some statements regarding the evidence on the record. Ultimately, the trial court found Julia and Jason guilty of Count 3 of the indictment, "Leaving the Scene of an Accident/Complicity" in violation of R.C. 2923.03(A)(2) and R.C. 4549.02(A)(1)/(B)(2)(b), a fourth degree felony, and Count 4 of the indictment, "Tampering with Evidence/Complicity" in violation of R.C. 2923.03(A)(2) and R.C. 2921.12(A)(1), a third degree felony.

{¶10} As for the remaining charges pending against Julia, the trial court found Julia not guilty of both counts of Vehicular Assault, reasoning that while she may have been negligent in causing the accident, she was not reckless, as exhibited by her speed at the time of the crash (roughly 12 or 13 mph). Nevertheless, the trial court initially stated that Julia was guilty of the "lesser-included offense" of Negligent Assault, despite no requests for any lesser-included offenses to be considered by either party. Although the trial court made this initial "finding" regarding lesser-included offenses, at sentencing the trial court subsequently withdrew the findings of guilt regarding-lesser included offenses and did not convict Julia of Negligent Assault, reasoning that an additional element was actually required to establish Negligent Assault. Thus Julia was entirely acquitted of the Vehicular Assault charges and no convictions were ever journalized regarding any purported lesser-included offenses.

{¶11} Following the findings of guilt against the Warners, but prior to sentencing, the Warners filed written, renewed motions for acquittal. They had previously made motions for acquittal during the trial. The Warners took issue with many of the trial court's factual "findings" and legal conclusions that led to the general findings of guilt.

{¶12} On April 14, 2021, the matter proceeded to sentencing; however, prior to sentencing the Warners, the trial court addressed the Warners' renewed motions for acquittal finding that defense counsel was mischaracterizing the evidence and/or the trial court's statements related to the evidence. The trial court further analyzed the evidence, explained its general findings, and overruled the Warners' motions for acquittal. The trial court also filed a written entry denying the renewed motions for acquittal for the reasons stated on the record.

{¶13} The trial court then proceeded to sentencing solely on Counts 3 and 4 of the indictment, ordering Jason and Julia to both serve eighteen months in prison for "Leaving the Scene of an Accident/Complicity," and twenty-four months in prison for "Tampering with Evidence/Complicity." Those prison terms were ordered to be served concurrently, so Jason and Julia Warner each received a twenty-four-month prison term. A judgment entry memorializing Jason's sentence was filed April 16, 2021. It is from this judgment that Jason now appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**Appellant was convicted in the absence of evidence sufficient to support findings of guilty in violation of his rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.**

**Assignment of Error No. 2**
**Appellant's convictions were against the manifest weight of the evidence in violation of his right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.**

**Assignment of Error No. 3**
**The trial court's guilty verdicts constituted a legal impossibility, were contrary to law, and violated Appellant's rights to due process and a fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitutions and comparable provisions of the Ohio Constitution.**

**Assignment of Error No. 4**
**The trial court's repeated misconduct throughout its deliberations and Appellant's sentencing violated his rights to due process and a fair trial as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.**

**Assignment of Error No. 5**
**Appellant was deprived of a fair trial by the cumulative errors of the trial court in violation of his right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.**

*First Assignment of Error*

{¶14} In his first assignment of error, Jason argues that there was insufficient evidence presented to convict him of "Leaving the Scene of an Accident/Complicity" and "Tampering with Evidence/Complicity."

Standard of Review

{¶15} "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Groce*, 163 Ohio St.3d 387, 2020-Ohio-6671, ¶ 7. Therefore, our review is de novo. *In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, ¶ 3. In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow *any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus (superseded by constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 102, (1997), fn. 4) following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

Controlling Statutes

{¶16} In this case, Jason was convicted of a violation of R.C. 4549.02(A)(1)/(B)(2)(b), and a violation of R.C. 2921.12(A)(1), both by means of being Complicit pursuant to R.C. 2923.03(A)(2).

{¶17} Revised Code 4549.02(A)(1)/(B)(2)(b) (Failure to Stop After an Accident or, as styled here, "Leaving the Scene of an Accident") reads as follows:

> **(A)(1) In the case of a motor vehicle accident or collision with persons or property on a public road or highway, the operator of the motor vehicle, having knowledge of the accident or collision, immediately shall stop the operator's motor vehicle at the scene**

**of the accident or collision. The operator shall remain at the scene of the accident or collision until the operator has given the operator's name and address and, if the operator is not the owner, the name and address of the owner of that motor vehicle, together with the registered number of that motor vehicle, to all of the following:**

**(a)   Any person injured in the accident or collision;**

**(b)   The operator, occupant, owner, or attendant of any motor vehicle damaged in the accident or collision;**

**(c)   The police officer at the scene of the accident or collision.**

**\* \* \***

**(B)(1) Whoever violates division (A) of this section is guilty of failure to stop after an accident. Except as otherwise provided in division (B)(2) or (3) of this section, failure to stop after an accident is a misdemeanor of the first degree.**

**(2)   If the accident or collision results in serious physical harm to a person, failure to stop after an accident is whichever of the following is applicable:**

**\* \* \***

**(b)   If the offender knew that the accident or collision resulted in serious physical harm to a person, a felony of the fourth degree.**

Revised Code 2921.12(A)(1) (Tampering with Evidence) reads as follows:

**(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:**

**(1)   Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]**

Jason was alleged to commit the above crimes via Complicity, which as charged in this case is codified in R.C. 2923.03(A)(2). This provision, and other relevant provisions of the statute read:

> **(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:**
>
> **\* \* \***
>
> **(2) Aid or abet another in committing the offense[.]**
>
> **\* \* \***
>
> **(B) It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender.**
>
> **\* \* \***
>
> **(F) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense.**

Evidence Presented

{¶18} The record indicates that on the evening of June 3, 2020, Jason and his wife, Julia, went to the residence of Todd and Kimberly Anderson for a social gathering. The Warners and the Andersons were very close friends, and had been for years. Kimberly Anderson was having a female friend visit from out-of-town, so she was hosting a gathering that Julia was attending. Jason was planning on attending a separate social gathering with Todd that evening.

{¶19} The Warners arrived at the Andersons' residence around 6:00 p.m. At that time, Todd Anderson was not home. However, shortly after Todd arrived home around 6:30 p.m., Todd and Jason left the Andersons' residence and went to their own social gathering at the home of Rob Lust. Todd, Jason, Robb, and others were part of a group planning a "cigar smoker," a cigar-related event. (Tr. at 223). While at Rob Lust's home, Todd had a few drinks and he thought Jason might have had a drink but Todd was unsure. Regardless, Todd and Jason returned to the Andersons' residence between 11:30 and 11:45 p.m.

{¶20} Meanwhile, at the Andersons' residence, Julia and Kimberly were drinking wine and snacking. Julia admitted to having three drinks throughout the evening, claiming that her last drink was at 9:30 or 10 p.m. Kimberly's guests at the social gathering, other than Julia, left around 10-10:30 p.m. Julia stayed at the Andersons' residence until Jason returned with Todd. At that time, the Warners left together, with Julia driving the black Jeep Wrangler they owned. The Warners' home was approximately a 15-20 minute drive.

{¶21} On the ride home, Julia was driving south on SR 203 approaching an intersection with CR 106, also known as Somerlot Hoffman Road. The area was relatively rural. Julia slowed down to make the turn onto Somerlot Hoffman Road from 25 mph to 12 or 13 mph. However, she failed to yield to a driver coming north on SR 203 before she made her turn. Julia would later claim that she thought there

was a stop sign in the opposite direction, and, alternatively, that she misjudged the turn. Regardless of the reason, the Warners' vehicle struck a BMW X3 being driven by Colton G. The collision caused Colton to veer off the road into a telephone pole. Colton's vehicle was seriously damaged to the point that the engine compartment on the left side was shifted toward the passenger compartment. (State's Ex. 23). Colton was trapped inside the vehicle.

{¶22} Jennifer Mehaffey resided at 2815 Larue Prospect Road South approximately 185 yards south of the crash intersection. At the time of the crash, Jennifer's daughter, Ashtan, and her boyfriend, Marquis, were on the front porch of the residence. Marquis saw Colton's silver vehicle drive past the residence, then he heard the crash at the intersection. Marquis stated he did not have a clear view of the intersection from the porch due to the angle.

{¶23} When he heard the crash, Marquis stepped off the porch and moved toward the intersection. As he did, he saw two people outside of the damaged vehicles: a woman who had her hands to her face looking into the silver crashed vehicle, and a man. Ashtan testified that she also saw a male and a female outside of the crashed vehicles.

{¶24} Ashtan notified her mother Jennifer of the incident, who was upstairs when it happened, and Ashtan called 911. Jennifer came outside and saw someone

circling the damaged vehicle, although she thought she saw a male get out of the driver's side of the Jeep and get into the passenger side of the Jeep Wrangler.

{¶25} Seeing the male and female together at the crash site from a distance, Marquis thought that the two must be exchanging information from the accident, and that they had the situation handled, so he changed direction and began walking back toward the porch. However, shortly thereafter, the Jeep Wrangler left the scene of the accident and the individuals were gone. When Marquis realized that both individuals from the scene were gone, yet one vehicle was still present, he ran to the damaged vehicle.

{¶26} Another individual, Keith Bentley, lived slightly closer to the rural intersection where the accident occurred, but to the north of it, and he also heard the crash. At the time of the crash, Keith was sitting in his living room watching television when he heard a "loud pop." (Tr. at 64). He went to his door and saw two vehicles, one of which had struck the pole on his property. The pole was approximately 85 yards away from Keith at that time.

{¶27} Keith walked out of his house to the southern portion of his driveway and he saw a male figure walking around the crashed vehicle. Keith went back into his house to get flashlights and a raincoat, but as he did, the Jeep Wrangler left the scene. Keith did not see a second person at the crash site, and he did not see who was driving when the Jeep Wrangler departed.

{¶28} After the Jeep Wrangler left the scene of the accident, Marquis, Jennifer and Keith went to the area of the crash to check on the other vehicle. When Marquis arrived, he saw the driver of the crashed vehicle bleeding, with the airbags deployed. Marquis indicated that the vehicle was noisy and smoking from the front. Marquis and Keith both asked the driver some questions, but according to them, the driver was not making sense. Keith described Colton as "very disoriented." (Tr. at 70).

{¶29} Jennifer was a nurse, so she got into Colton's vehicle and helped stabilize Colton's head/neck until emergency services responded. Upon arrival, emergency services noted that Colton was trapped in the vehicle, that he was semi-conscious, had a large "goose egg" on his head, and that Colton did not know the place and time. (Tr. at 123). Firefighters employed a "hydraulic spreader" to extricate Colton from the vehicle. He was taken to Marion General Hospital, but he had to be transferred to another hospital because Marion General was not a trauma hospital.

{¶30} Shortly after the crash, after midnight on June 4, 2020, David Bailey was walking around his cul-de-sac to deal with medical issues. He lived near the Warners. Despite the fact that he was wearing headphones and listening to music, he heard a very loud noise approaching and saw a black Jeep Wrangler coming up his road. According to him, the vehicle was making "all kinds of noise." (Tr. at

126). He stressed that it was "[r]eal loud[.]" (*Id.*) David watched the Jeep Wrangler pull into the Warners' garage and the garage door closed behind it. David did not see who was driving the vehicle.

{¶31} According to testimony, the Warners' residence was approximately 5.5 miles from the crash site. The Warners made no calls and sent no text messages regarding the accident over the next 8 hours.

{¶32} At 8:06 a.m. on June 4, 2020, Jason sent a text message to an employee at the Marion County Common Pleas Court stating that he had a personal issue that he had to deal with and that he would not be at work. Jason was an elected common pleas court judge. He asked if another judge could cover his docket for the day.

{¶33} Around 9:30 a.m. on June 4, 2020, Jason and Julia willingly went to the police to report the accident and were transferred to the Ohio State Highway Patrol, which was handling the crash investigation. Jason and Julia met with Marion Post Commander Troy Sexton of the State Highway Patrol. At that time, Julia admitted she was driving the vehicle during the crash. She filled out a written statement indicating that she thought there was a stop sign in the other direction and that after the crash she panicked and drove away. When questioned by Commander Sexton, Julia denied being impaired at the time of the crash, though she admitted to having three drinks that night, ending as late as 10 p.m.

{¶34} Commander Sexton testified that he did not give Julia a field sobriety test during the interview because he did not feel she was impaired at the time of the interview. He also did not administer a blood test because there was a time restriction on law enforcement wherein they were expected to get any alcohol or drug results after a crash and they were past the time limit. (Tr. at 198). However, the Warners gave law enforcement permission to go to their residence and inspect the Jeep, collect evidence, and take DNA samples.

{¶35} At 12:47 p.m. that same day, Jason sent a text message to the other elected judge of the Marion County Common Pleas Court, and to some of the staff members of the court. The text stated that Jason and Julia had been in a "pretty serious car accident." (State's Ex. 46). Jason stated that Julia failed to yield and hit another vehicle, and that, "in a hysterical panic, [she] drove away from the scene of the accident. After a long discussion that went on throughout the night, we agreed that we needed to go in and report it, which we did this morning." (*Id.*)

{¶36} On the same day that the Warners reported the accident, law enforcement officers went to the Warners' residence to take pictures of their damaged Jeep Wrangler. The Jeep was in the garage when officers arrived, and after they took initial photographs, they asked Jason to back the Jeep out of the garage. Jason did so, with some difficulty.[5] One officer noted that the damage to

---

[5] Officers on the scene did not notice if Jason moved the seat or not prior to backing the vehicle out of the garage.

the driver's-side front tire would have made the vehicle extremely difficult to drive. Testimony indicated that the "rim ha[d] been separated from the tie rod end underneath the fender well." (Tr. at 205). Photographs of the Warners' Jeep showed extensive damage to the left front wheel, including a deflated tire. There was also "buckling * * * on the left front fender above the wheel well." (State's Ex. 23). Due to the deflated tire, there were marks in the road and in the driveway leading to the Warners' garage from where the rim had scraped the asphalt. There were additional marks made when the vehicle was pulled out of the garage.

{¶37} With the Warners' permission, law enforcement officers collected the airbags that had deployed from the vehicle. DNA samples were taken from each airbag. DNA consistent with Julia's was found on the driver's-side airbag, and DNA consistent with Jason's was found on the passenger's-side airbag. Julia also had bruising consistent with the driver's-side seatbelt. Once officers were done with the vehicle, it was towed to Buckeye Collision.

{¶38} The next day, June 5, 2020, Jason returned to work. That day, he had a meeting scheduled with the other Marion County Common Pleas Court Judge, Judge Edwards, about court matters unrelated to the crash. Following the meeting, Judge Edwards asked to speak with Jason privately about the accident, because the local chief of police had indicated that Jason might have been the driver of the

vehicle in the crash, which was contrary to what Jason had said in his text message to Judge Edwards.

{¶39} Jason denied being the driver, and told Judge Edwards that he was "passed out" when the collision occurred. (Tr. at 433). According to Judge Edwards, after Jason said the words "passed out," it "was almost like his tongue came out of his mouth and tried to grab the words and pull them back in. And [Jason] said instead that he was asleep. [Jason] said: Well, you know, asleep." (*Id*.)

{¶40} Jason told Judge Edwards that he was awakened by the impact, that he recalled looking up and seeing his wife bleeding from her nose, and that he then remembered the sound of the Jeep Wrangler pulling off. Judge Edwards indicated that it left him with the impression that Jason was sleeping through most of the incident. Further, Judge Edwards testified that he felt that was the impression Jason wanted him to have from the conversation.

{¶41} Later that same day, Judge Edwards went to Buckeye Collision to check on a vehicle he was having restored there. While there, he saw the Warners' Jeep Wrangler in the parking lot, which he was familiar with. Judge Edwards was "shocked" at the damage, especially to the driver's side front wheel. (Tr. at 437). It caused him to question how Jason could have been asleep. He also noticed the airbags had been removed from the vehicle, and he sent Jason a text message to ask

who had removed them, thinking that it could be tampering with evidence if Jason had done it, but the airbags had been removed by law enforcement.

**{¶42}** In the week following the accident, Colton was released from the hospital. However, he was having significant memory issues that required him to stay with his family. While Colton was staying with his family, and not present at the apartment he rented, a letter was dropped off that was written by Julia apologizing for the accident. She stated she was very sorry, that she did not want Colton to think she was "crazy, or drunk, or insensitive." (State's Ex. 41). She stated that it was not like her to misjudge a turn in the dark and the rain, and that it was not like her to "freak out" and "panic and leave[.]" (*Id*.)

**{¶43}** From June 9, 2020, to June 17, 2020, Julia and Jason went on a pre-scheduled vacation with the Andersons to Texas. According to the Andersons, the accident was never discussed.

**{¶44}** On June 19, 2020, just over two weeks after the accident, a televised news story aired about the crash. The story contained information that witnesses in the area of the accident saw a man exit the Jeep Wrangler at the crash site. Judge Edwards saw the news story and sent a text message to Jason about it because Jason had not indicated he had gotten out of the Jeep at the scene previously. Rather, Jason had left Judge Edwards with the impression that he had been sleeping. When asked by Judge Edwards, Jason acknowledged getting out of the Jeep. Judge

Edwards asked Jason if Jason had informed disciplinary counsel about the incident, and Jason responded that he did not think he had done anything wrong.

{¶45} Over the ensuing months, Colton went through physical therapy and had various medical issues including memory problems, a concussion, a kidney tear, cellulitis, knee/walking problems, and bell's palsy. The parties stipulated at trial that he suffered serious physical harm as a result of the accident.

Analysis

{¶46} At the outset of our review of sufficiency of the evidence, we note that many of Jason's arguments in his brief related to sufficiency of the evidence challenge specific statements the trial court made on the record explaining its "reasoning" before entering its general finding that Jason and Julia were guilty of Counts 3 and 4 and the indictment. Importantly, and as the trial court noted before making those statements, there *is no obligation whatsoever for the trial court to make factual findings or to express its reasoning that led to the general finding*. *State v. Ham*, 3d Dist. Wyandot No. 16-09-01, 2009-Ohio-3822, ¶ 37.

{¶47} Rather, pursuant to Crim.R. 23(C), in a trial without a jury, the court "shall make a general finding." This Court has repeatedly expressed, in varying circumstances, that anything stated beyond the required "general finding" of guilt or innocence in a criminal bench trial is " 'mere surplusage without legal significance.' " *State v. Ham*, 2009-Ohio-3822 at ¶ 37, citing *State v. Crawford*,

10th Dist. Franklin No. 85AP-324, 1986 WL 1715 at *7 ("Therefore, *sub judice,* the trial court should only have entered findings of guilty based upon the evidence. Separate findings of fact and conclusions of law are neither countenanced nor permitted. Therefore, we find the trial court's reasoning as mere surplusage without legal significance sufficient to impeach the general findings of guilt."); *see also State v. Fisher*, 3d Dist. Auglaize No. 2-10-09, 2010-Ohio-5192, at fn 2 ("We note that the trial court issued written findings of fact in this case, which is contrary to the directive contained in Crim.R. 23. When a bench trial is held, the court is to make a general finding; i.e. guilty or not guilty."); *State v. Kalonji*, 3d Dist. Paulding No. 11-15-07, 2016-Ohio-991 at fn. 3 ("Because the trial court's purported findings of fact are mere surplusage, the trial court's use of an erroneous date—August 26, 2015 rather than July 4, 2015—has no bearing on our disposition of this appeal.").

{¶48} Other Ohio Appellate Courts have also indicated that anything beyond a trial court's general finding in a criminal bench trial constitutes "surplusage" without legal significance. *See State v. Brown*, 9th Dist. Summit No. 25287, 2011-Ohio-1041, ¶¶ 41-42; *Crawford*, *supra*; *State v. Cattledge*, 10th Dist. Franklin No. 10AP-105, 2010-Ohio-4953, ¶ 26; *State v. Singleton*, 2d Dist. Montgomery No. 27916, 2019-Ohio-1477, ¶ 18; *but see State v. Ndiaye*, 10th Dist. Franklin No. 19AP-10, 2020-Ohio-1008, ¶ 30, appeal not allowed, 159 Ohio St.3d 1437, 2020-Ohio-3634 (indicating that a trial court's comments made *after* a general finding of

guilt were surplusage, but if the comments or statements were made before a general finding of guilt the comments may not be surplusage).

{¶49} Thus based on the authority cited, we could overrule Jason's challenges to the trial court's statements as those challenges are mere surplusage without legal significance whatsoever. However, notwithstanding this point, we review the sufficiency of the evidence on appeal in the light most favorable to the prosecution to examine whether the evidence would allow *any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus (superseded by constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 102, (1997), fn. 4) following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). We are not tasked with reviewing any specific statements of the trial court in a sufficiency review, regardless of whether the statements are categorized as "findings" or "surplusage." Rather, we must look at the evidence.

{¶50} Thus, turning to the evidence presented in this matter, we must determine whether the evidence supports Jason's convictions for Complicity to Failure to Stop After an Accident and Complicity to Tampering with Evidence.

{¶51} Importantly, Jason was convicted of Complicity through "aiding and abetting." "To support a conviction for Complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported,

assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 245 (2001). Furthermore, "'[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" *Id*. quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 57 O.O.2d 38, 41 (1971).

**{¶52}** Regarding his convictions for Complicity to Failure to Stop After an Accident and Complicity to Tampering with Evidence, Jason contends that the evidence never established that he was a principal actor in this case, *and* that he did nothing that would constitute aiding and abetting Julia. Essentially, he contends that he was simply present for the incident that occurred, and he argues that, legally, presence or acquiescence alone is not enough to support aiding and abetting. *State v. Law*, 1st Dist. Hamilton No. C-950651, 1996 WL 539792.

**{¶53}** However, Jason's argument that he was merely "present" for the incident ignores several key facts. First, and most importantly, once the crash occurred, Jason *got out of the vehicle and was observed walking around the accident scene*. He was observed *looking into Colton's vehicle*, wherein Colton was, at best, semi-conscious, trapped, bleeding, and had his airbags deployed.

**{¶54}** After seeing the significant damage to Colton's vehicle, and presumably to the driver himself, Jason got back into his own damaged vehicle with his wife and left the scene. Their own vehicle was extremely noisy, by all accounts likely difficult to control, and riding on a rim that was scraping the road. Still they did not stop. Then, when the Warners got home, Jason and Julia, by Jason's own statement, talked about the matter throughout the night for over 8 hours before deciding to come forward and admit that they had been in the vehicle that caused Colton serious physical harm.

**{¶55}** While Jason's decision to get back into the vehicle after seeing the damage that had been caused from the crash might not alone have been overwhelming evidence to show that he was aiding and abetting, there is also evidence of his conduct after-the-fact to consider. When asked about the incident, Jason initially told Judge Edwards that he was "passed out" or asleep when everything occurred. It was only when confronted with statements from other witnesses that Jason admitted to getting out of his vehicle. This is evidence that a factfinder could utilize to determine that Jason was aware he was aiding and abetting his wife by leaving the scene of the accident.

**{¶56}** Based on our review of the record in its entirety, we find that a rational trier-of-fact could determine from all the evidence presented that the elements of Complicity to Failure to Stop After an Accident were established here. In sum, it is

essentially undisputed that the accident was caused by Julia, that Jason and Julia got out of their vehicle, looked into Colton's vehicle, that Colton suffered serious physical harm, and that the Warners drove off anyway after viewing the scene. The primary issue is simply whether there was sufficient evidence to find that Jason aided and abetted his wife, and under the facts and circumstances of this case, we find that a rational trier of fact could determine as much beyond a reasonable doubt. Thus Jason's arguments related to Complicity to Failure to Stop After an Accident are not well-taken.

{¶57} Turning to the conviction for Complicity to Tampering with Evidence, it was undisputed that the Warners left the scene and it is a readily permissible inference that they knew an investigation of the crash was likely to begin. Despite this, even after viewing Colton trapped in his vehicle, they left the scene making what would have been a difficult 5 mile drive in their damaged jeep in order to place it in their enclosed garage. Law enforcement testified that this hindered their investigation.

{¶58} Again, based on Jason's own statements and actions, and his decision to get back into the vehicle after viewing the scene, we cannot find that there was insufficient evidence presented to convict him of Complicity to Tampering with Evidence.[6] A rational trier-of-fact could find beyond a reasonable doubt that this

---

[6] In his brief, Jason challenges numerous statements made by the trial court, arguing that the trial court was "confused" as to what crimes were indicted in this matter due to the way the trial court worded or phrased

was not a situation where Jason was merely "present" for the incident. For all of these reasons, Jason's first assignment of error is overruled.

*Second Assignment of Error*

{¶59} In his second assignment of error, Jason argues that even if there was sufficient evidence presented to convict him, his convictions were against the manifest weight of the evidence.

Standard of Review

{¶60} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, " 'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier-of-fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier-of-fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the

---

the crimes at times. At best, Jason's arguments are not persuasive given that the trial court found the Warners guilty of "Count 3 and Count 4" at the trial, then referenced the counts in the indictment at the sentencing hearing and in the final judgment entry. There is no confusion expressed by the trial court and Jason never objected to how the trial court worded matters at the time they were spoken. The Warners were ultimately convicted of the specific counts they were charged with in Counts 3 and 4 of the indictment.

manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

Analysis

**{¶61}** In his second assignment of error, Jason contends that even if there was sufficient evidence to convict him, his convictions were against the manifest weight of the evidence. He summarily refers to arguments he made in his first assignment of error and then contends that the greater weight of the credible evidence demonstrated that Jason did not aid or abet Julia in any manner. Further, he claims that none of the witnesses observed Jason speaking with Julia, providing advice, guiding her to the Jeep, or assisting with its operation. He again maintains he was merely present for what happened.

**{¶62}** However, as we stated in the previous assignment of error, Jason was not merely in the Jeep as a passenger while this event occurred. He got out of the Jeep, viewed the wreckage, then decided to get back into the vehicle. Then, in the days after the incident, he lied about the fact that he was asleep during the crash, minimizing his conduct, and he only admitted to getting out of the vehicle when confronted with statements of witnesses at the scene. Jason further acknowledged in his text messages that he and his wife went home and discussed the matter for

hours before deciding to report the accident to law enforcement. As noted previously, " '[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.' " *State v. Johnson*, 93 Ohio St.3d 240, 245 (2001). A factfinder could find that these incidents were circumstantial evidence of Jason's Complicity in this matter to Failure to Stop After an Accident and Tampering with Evidence.

{¶63} We note that we are aware of Jason's repeated challenges in his brief to the trial court's statements made prior to announcing the general finding of guilt. Initially, we again refer to the "surplusage" law of the previous assignment of error. Completely notwithstanding the surplusage point, however, we note that Jason's arguments often cherry-pick statements of the trial court or read them out of context to suit his claims. For example, Jason strongly challenges the trial court's statement that "there was conflicting testimony – and I think perhaps maybe this is the State's theory, I don't know, in charging aiding and abetting. There is evidence that Jason warner was driving [after the accident]." (Tr. at 529). The trial court also later stated, "I think it's more likely that Jason Warner drove away" because the vehicle would be "extremely difficult for a woman to control the operation of that [damaged Jeep.]" (Tr. at 532).

{¶64} Jason argues that these statements are unsupported by the evidence, and that the latter is simply sexist. However, taking these statements alone and out-

of-context ignores other more definite statements wherein the trial court states: "Now, whether – whichever one drove it, it doesn't matter for aiding and abetting purposes, because you can be charged as the principal offender, or as an aider and abettor." (Tr. at 530). Further, the trial court found, after discussing who may have driven the vehicle, "In any event, the Court finds beyond a reasonable doubt that they aided or abetted in the commission of the offense of leaving the scene of the accident." (Tr. at 533). Finally, the trial court stated, "For all these reasons, *and all of the other reasons in the record*, the Court finds both Defendants guilty of Count 3 and Count 4."[7] (Tr. at 538).

{¶65} Notably, because of the Warners' challenges to the trial court's statements made prior to the general findings of guilt, and because of the Warners' renewed motions for acquittal prior to sentencing in this matter, the trial court again addressed its statements from the trial at the sentencing hearing. At that time, the trial court said, *inter alia*, "The Court does not know – and as I said – for sure, who was driving [after the accident]. All the Court can say is that based on the law and the evidence, they acted in concert with one another." (Sent. Tr. at 28). Thus Jason's references in his brief to isolated statements such as the one that it was "more likely" that Jason was driving ignore the fact that the trial court stated it was ultimately

---

[7] Notably, the State did argue in closing that reasonable minds could differ as to who drove the Jeep from the crash site. The State questioned whether Julia was strong enough, noted that Jason quickly volunteered to move the Jeep when law enforcement asked, and law enforcement testified the vehicle would be very difficult to move/direct.

irrelevant who was driving based on the finding the trial court made.[8] Further explanations like this establish that Jason's attempt to randomly pick statements made by the trial court, without viewing everything in its entirety, is problematic. Thus even if the comments were not "surplusage", the trial court clarified its findings and we see no prejudicial error here because the appropriate general findings were made and they were supported by the evidence.

{¶66} After reviewing the record, giving deference to credibility findings of the trial court, we cannot find that the trial court clearly lost its way by convicting Jason of Complicity to Failure to Stop After an Accident and Complicity to Tampering with Evidence. Therefore, Jason's second assignment of error is overruled.

*Third Assignment of Error*

{¶67} In Jason's third assignment of error, he contends that the trial court's determination that both of the Warners were guilty of Failure to Stop After an Accident and Tampering with Evidence via Complicity constituted a legal impossibility. He argues that there were only two individuals who could have been the principal offenders and that by convicting each defendant of Complicity, the trial court effectively found that both individuals were principal actors and both

---

[8] Jason states that "more than likely" is a preponderance finding and does not equate to beyond a reasonable doubt. While this may have been true if the trial court rested solely on this point, as we have stated, the trial court made numerous statements that, if we were to consider them anything other than surplusage, must be viewed in their entirety.

-31-

were aiders and abettors. Jason argues that this leads to the impossibility of Jason being guilty of Complicity in his indicted crimes, and effectively "guilty" as the "primary offender" in Julia's indicted crimes. In his brief, he argues: "No single person is capable of being two separate people at the same time. Similarly, no person can simultaneously be guilty and not guilty of the same offense as asserted in a single count of an indictment." (Appt.'s Br. at 22).

{¶68} First, we note that Jason's argument hinges largely on challenging not only his conviction, but also Julia's conviction. It is unclear, at best, to what extent he would have standing to do so. "The issue at trial was not the absent principal's guilt, but rather the appellant's guilt." *State v. Graven*, 52 Ohio St.2d 112, 116 (1977).

{¶69} Second, and notwithstanding the first point, the Complicity statute itself *directly addresses the situation where there is no convicted principal*. As noted earlier, pursuant to R.C. 2923.03(B), "It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender."

{¶70} Essentially Jason is arguing that he cannot be convicted of Complicity if his wife is not the principal offender. However, the trial court could have found that she was the principal offender or that she was not; regardless, the trial court could readily have found that Jason aided and abetted her in committing those

offenses. Julia's status as principal or not a principal does not create a defense in this matter per the Complicity statute itself. In fact, even if Julia had been acquitted of either being a principal or being complicit, Jason *still* could have been convicted of Complicity. *See Graven*, *supra*.

{¶71} Given the plain statement in the Complicity statute, and Jason's failure to cite any legal authority that would compel us otherwise, we cannot find that his convictions constituted a legal impossibility. Therefore, Jason's third assignment of error is overruled.

*Fourth Assignment of Error*

{¶72} In his fourth assignment of error, Jason argues that the trial court committed "repeated misconduct" during its "deliberations" and at Jason's sentencing hearing. Jason argues that the same standard that would apply to juror misconduct should apply in a bench trial.

{¶73} As support for his statement that the trial court committed misconduct, Jason cites the trial court's statements in what he characterizes as the trial court's "findings." He argues that the trial court made "findings" to support the convictions that were directly contradicted by the record "and or consisted of impermissible, baseless, and sexist stereotypes." (Appt.'s Br. at 23). Further, Jason brings up the fact that the trial court initially stated Julia was guilty of the lesser-included offenses of Negligent Assault, before concluding that Negligent Assault actually contained

an additional element and thus was not actually a lesser-included offense. In addition, Jason takes issues with the trial court's statement at sentencing that it had

> **pulled out his docket, and [in] 2019 and 2020, he handled at least eight cases or more involving drunk driving. So he knows exactly what the time frame is. You have three hours, three hours to take a breath test from the time of the accident. There is even case law saying that because the test has substantial compliance, it can be even later, up to six hours.**

(Sent. Tr. at 24-25). Jason contends that this constituted improper judicial investigation into the matter. Finally, Jason argues that the trial court's statement that it was not unusual for an elected official to have a nonexistent criminal history, and thus a low "ORAS" score, showed that the trial court failed to conduct a meaningful review of Ohio's sentencing factors.

{¶74} Dealing first with Jason's arguments regarding the trial court's statements prior to its general finding of guilt, again these could be viewed as surplusage, but even if they were not, the trial court further explained its findings. Thus while the trial court might have found it hard to believe that Julia could have driven the severely damaged vehicle after the accident, the trial court also stated that it was irrelevant who was driving because the Warners aided and abetted each other. Thus any of the trial court's comments regarding Julia or gender are really irrelevant to the final determination. Similarly, we find that the trial court's over-arching finding was that the evidence supported the crimes.

**{¶75}** Next, as to Jason's claims regarding the lesser-included offenses, the lesser-included offenses were not charges even levied against him, thus he has no standing to contest them. They do not impact his case. Moreover, there are no convictions for Negligent Assault against anyone in this case for us to actually review. Thus even if there was any improper comment by the trial court, the trial court corrected the matter itself and there is no resulting prejudice. This argument is not well-taken.

**{¶76}** Regarding the trial court's statement at the sentencing hearing that it had pulled Jason's docket related to drunk-driving offenses, there was actual testimony from law enforcement in this case about how the time for alcohol testing had passed, juxtaposed with Jason's admitted decision to wait approximately eight hours after the accident to report it, so it carried some relevance. Regardless, the rules of evidence do not even apply at sentencing hearings. Evid.R. 101. Furthermore, the trial court's statement only emphasized what was already presumed—that Jason was familiar with drinking and driving-related cases. In fact, the State argued in its closing argument that as a Judge, Jason would be aware that the Warners needed to stop after the accident and that there was a limited amount of time that the Warners could be tested for alcohol or drugs. Given that the rules of evidence do not apply in sentencing hearings, and given that the handling of any cases would likely be a matter of public record, we can find no error here.

{¶77} Finally, as to Jason's claim that the trial court erred at sentencing and failed to conduct a meaningful review of the sentencing factors by stating it was not unusual that Jason had no criminal history as a public official, the trial court did what it was supposed to do and considered the fact that Jason had led a law-abiding life, and balanced that against him being a public official along with the nature of the crimes committed. Moreover, the trial court explicitly stated it had considered the factors in R.C. 2929.11 and R.C. 2929.12 and it did not have to do any more than that. *State v. Osting*, 3d Dist. Defiance No. 4-18-09, 2019-Ohio-1278, ¶ 9. Furthermore, in *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, the Supreme Court of Ohio conclusively held that there is no basis for an appellate court to modify or vacate a sentence even if the appellate court concludes that the record does not support the sentence under R.C. 2929.11 and R.C. 2929.12.

{¶78} In sum, we cannot find under the facts and circumstances of this case that the trial court failed to conduct a meaningful review of the sentencing factors where the trial court explicitly stated it had reviewed the sentencing factors. Moreover, under *Jones* we could also find no basis for reversal. For all of these reasons, Jason's fourth assignment of error is overruled.

*Fifth Assignment of Error*

{¶79} In his fifth assignment of error, Jason argues that even if there was no single error prejudicial enough to reverse his convictions, the cumulative errors in

-36-

this case combined were prejudicial. As support for his argument, he reasserts numerous claims referenced in the previous assignments of error.

### Standard of Review

{¶80} "Under [the] doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Spencer*, 3d Dist. Marion No. 9-13-50, 2015-Ohio-52, ¶ 83, citing *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶¶ 222-224 and *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). " 'To find cumulative error, a court must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors.' " *State v. Stober*, 3d Dist. Putnam No. 12-13-13, 2014-Ohio-5629, ¶ 15, quoting *In re J.M.*, 3d Dist. Putnam No. 12-11-06, 2012-Ohio-1467, ¶ 36.

### Analysis

{¶81} Because we have not found multiple errors in this matter, the doctrine of cumulative error does not apply. *State v. Carpenter*, 3d Dist. Seneca No. 13-18-16, 2019-Ohio-58, ¶ 104, citing *State v. Bertuzzi*, 3d Dist. Marion No. 9-13-12, 2014-Ohio-5093, ¶ 110. Therefore, Jason's fifth assignment of error is overruled.

*Conclusion*

{¶82} For the foregoing reasons, Jason's assignments of error are overruled and the judgment and sentence of the Marion County Common Pleas Court is affirmed.

***Judgment Affirmed***

**ZIMMERMAN, J., MILLER, J., and SHAW, J., concur.**

**/jlr**